**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHERIF E. EL DABE, JOHN O'HANLON, AND ELLIOT C. NELMS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CALAVO GROWERS, INC., LECIL E. COLE, ARTHUR BRUNO, JAMES E. SNYDER, EGIDIO CARBONE, GEORGE BARNES, MIKE A. DIGREGORIO, STEVEN W. HOLLISTER, JOHN M. HUNT AND ERNST & YOUNG, LLP<br><br>Defendants. | **No. 2:15-cv-00400-GW-AS**<br><br>**<u>CLASS ACTION</u>**<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiffs Sherif E. El Dabe, John O'Hanlon and Elliot C. Nelms ("Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Amended Complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Calavo Growers, Inc., ("Calavo" or the "Company"), analysts' reports and advisories about the Company, Interviews with former Calavo employees, Interviews with former Renaissance Food Group

Employees, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased or otherwise acquired Calavo common stock between September 9, 2014 and January 14, 2015, both dates inclusive (the "Class Period"). Plaintiffs seek to pursue remedies against Calavo, certain of its officers and directors, and Calavo's outside auditor, Ernst & Young LLP ("E&Y"), for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Calavo markets and distributes avocados and other perishable foods worldwide to food distributors, produce wholesalers, supermarkets, convenience stores and restaurants. Calavo was founded in 1924 as a growers' co-op, but incorporated and went public in July 2002. The Company is headquartered in Santa Paula, California and trades on the Nasdaq Global Exchange ("NASDAQ") under the ticker symbol "CVGW."

3. In June 2011, Calavo acquired an entirely new line of business, Renaissance Food Group, LLC ("RFG"), a closely held fresh-food company that produces, markets and distributes nationally a portfolio of healthy, high quality lifestyle products for consumers.

4. The acquisition was part of a strategy to diversify its revenue stream, which would also offset the potential impact of the California drought on the production of avocados. The transaction, which closed in June 2011, settled for a combination of cash and stock, including Earn-Out payments based on financial performance.

5. However, the acquisition came with a steep price. Pursuant to the RFG Acquisition Agreement, Calavo agreed to pay on the closing date approximately $16 million. In addition, provided that RFG attained specified financial goals for certain 12-month periods prior to the fifth anniversary of the closing, the RFG Acquisition Agreement ***required*** Calavo to pay RFG up to approximately $84 million in additional Earn-Out payments, payable in cash and shares of unregistered Calavo common stock ("Earn-Out payments"). Accordingly, if the maximum Earn-Out payments were to be earned, the total consideration payable to RFG pursuant to the RFG Acquisition Agreement would be approximately $100 million from the time of closing to the end of the five-year Earn-Out payment period.

6. RFG substantially exceeded the financial goals. Thus, those very same profit increases over the three years following the Acquisition were offset by the maximum amount of Earn-Out payments.

7. Accounting rules required that these additional Earn-Out payments be recorded as an expense on Calavo's earnings statements, thereby reducing the RFG related profits. See ASC 450. In blatant disregard of this clear United States Generally Accepted Accounting Principles ("GAAP") rule, Calavo, with the

imprimatur of its auditor E&Y, buried these charges in "shareholder equity", which is an item on the balance sheet, below the line of net assets and liabilities.

8. By so doing, Defendants materially distorted Calavo's performance. Whereas, the Company had reported profits of $ 74.9 million for 2012, 2013 and the first nine months of fiscal 2014, in fact, properly accounting for the RFG Earn-Out payment would have wiped out the majority of its reported profits for most of those periods, the largest of which occurred during the Class Period. Net income and earnings per share were overstated by approximately **2,000%** for the nine months ending 2014. In 2014 alone, the restatement erased approximately $40 million of earnings.

9. After the close of the deal in 2011, and for the entire period leading up to and throughout the Class Period, Calavo lacked adequate internal controls, and upper management exhibited a total disregard for the accuracy of its published financial statements.

10. Specifically, during the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Calavo failed to maintain an accurately valued contingent consideration pursuant to its acquisition of RFG; (ii) Calavo recorded its contingent Earn-Out payment in equity rather than a liability, causing a vast overstatement of the resulting financials; (iii) Calavo understated its non-cash operating expenses resulting in an overstatement of net income, operating income and Earnings Per Share ("EPS"); (iii) the Company lacked adequate internal controls over financial reporting; and (iii) as a result of the

above, the Company's financial statements were materially false and misleading at all relevant times.

11. The fraudulent scheme was not revealed until January 15, 2015, when the Company disclosed that in connection with the preparation, review, and audit of the Company's consolidated financial statements required to be included in its Annual Report on Form 10-K for the fiscal year ended October 31, 2014, that it had identified a non-cash misstatement in its historical consolidated financial statements related to its treatment of contingent consideration in the acquisition of RFG in June 2011, causing Calavo to record a non-cash charge totaling $88.9 million before tax ($54.0 million net of tax) that was to be treated as an amortization expense, related to the misstatement in its treatment of contingent consideration.

12. The Company announced that the Audit Committee of the Board of Directors (the "Audit Committee") of Calavo concluded that the Company's consolidated financial statements for the fiscal years ended October 31, 2013 and 2012 and the quarters therein, as well as the quarters ended January 31, 2014, April 30, 2014 and July 31, 2014 (the "Relevant Periods"), should no longer be relied upon. Similarly, the Company announced that the related press releases and stockholder communications describing the Company's consolidated financial statements for the Relevant Periods should no longer be relied upon. Additionally, according to the Company, E&Y's reports on the consolidated financial statements, including E&Y's opinion on the effectiveness of internal control over financial reporting, likewise should no longer be relied upon.

13. The following chart evidences the enormity of the fraud:

| | Year Ended October 31, 2013 | | | Year Ended October 31, 2012 | | |
|---|---|---|---|---|---|---|
| | As reported | Adjustments | Restated | As reported | Adjustments | Restated |
| Net sales | 691,451 | — | 691,451 | 551,119 | — | 551,119 |
| Cost of sales | 631,327 | 676 | 632,003 | 490,453 | 1 | 490,454 |
| Gross margin | 60,124 | (676) | 59,448 | 60,666 | (1) | 60,665 |
| Selling, general and administrative | 33,217 | 268 | 33,485 | 32,713 | 1 | 32,714 |
| Contingent consideration related to RFG acquisition | 1,801 | 31,066 | 32,867 | 415 | 2,157 | 2,572 |
| Operating income (loss) | 25,106 | (32,010) | (6,904) | 27,538 | (2,159) | 25,379 |
| Equity (losses) in earnings from unconsolidated entities | (100) | — | (100) | 500 | — | 500 |
| Interest income | 255 | — | 255 | 229 | — | 229 |
| Interest expense | (1,098) | — | (1,098) | (1,152) | — | (1,152) |
| Other income, net | 448 | — | 448 | 887 | — | 887 |
| Income (loss) before provision for income taxes | 24,611 | (32,010) | (7,399) | 28,002 | (2,159) | 25,843 |
| Provision (benefit) for income taxes | 7,866 | (12,581) | (4,715) | 11,055 | (842) | 10,213 |
| Net income (loss) | 16,745 | (19,429) | (2,684) | 16,947 | (1,317) | 15,630 |
| Add: Net loss attributable to noncontrolling interest | 604 | 285 | 889 | 105 | 67 | 172 |
| Net income (loss) attributable to Calavo Growers, Inc. | 17,349 | (19,144) | (1,795) | 17,052 | (1,250) | 15,802 |
| Calavo Growers, Inc.'s net income (loss) per share: | | | | | | |
| Basic | 1.17 | (1.29) | (0.12) | 1.15 | (0.08) | 1.07 |
| Diluted | 1.17 | (1.29) | (0.12) | 1.15 | (0.10) | 1.05 |
| Number of shares used in per share computation: | | | | | | |
| Basic | 14,856 | — | 14,856 | 14,795 | — | 14,795 |
| Diluted | 14,863 | (7) | 14,856 | 14,808 | 292 | 15,100 |

14. Calavo also restated the quarters ended January 31, 2014, April 30, 2014 and July 31, 2014. The following financial information was disclosed in the Company's Form 10-K filed on January 30, 2015 regarding 2014 quarters. For the three months ended January 31, 2014, operating income was misstated by 240.0%, net income was misstated by 325.1% and earnings per share was overstated by 327.3%.

| | Three Months Ended January 31, 2014 | | | Three Months Ended January 31, 2013 | | |
|---|---|---|---|---|---|---|
| | As reported | Adjustments | Restated | As reported | Adjustments | Restated |
| Net sales | 168,165 | — | 168,165 | 139,499 | — | 139,499 |
| Cost of sales | 154,475 | 49 | 154,524 | 126,375 | 1 | 126,376 |
| Gross margin | 13,690 | (49) | 13,641 | 13,124 | (1) | 13,123 |
| Selling, general and administrative | 8,272 | 20 | 8,292 | 7,576 | — | 7,576 |
| Contingent consideration related to RFG acquisition | — | 9,218 | 9,218 | 1,245 | 8,152 | 9,397 |
| Operating income (loss) | 5,418 | (9,287) | (3,869) | 4,303 | (8,153) | (3,850) |
| Interest expense | (256) | — | (256) | (252) | — | (252) |
| Other income, net | 135 | — | 135 | 138 | — | 138 |
| Income (loss) before provision for income taxes | 5,297 | (9,287) | (3,990) | 4,189 | (8,153) | (3,964) |
| Provision (benefit) for income taxes | 1,822 | (3,898) | (2,076) | 1,508 | (4,020) | (2,512) |
| Net income (loss) | 3,475 | (5,389) | (1,914) | 2,681 | (4,133) | (1,452) |
| Add: Net loss attributable to noncontrolling interest | 500 | (352) | 148 | 26 | 16 | 42 |
| Net income (loss) attributable to Calavo Growers, Inc. | 3,975 | (5,741) | (1,766) | 2,707 | (4,117) | (1,410) |
| Calavo Growers, Inc.'s net income (loss) per share: | | | | | | |
| Basic | 0.25 | (0.36) | (0.11) | 0.18 | (0.28) | (0.10) |
| Diluted | 0.25 | (0.36) | (0.11) | 0.18 | (0.28) | (0.10) |
| Number of shares used in per share computation: | | | | | | |
| Basic | 15,726 | — | 15,726 | 14,834 | — | 14,834 |
| Diluted | 15,736 | (10) | 15,726 | 14,854 | (20) | 14,834 |

15. For the three months ended April 2014, operating income was overstated by 263.9%, net income was overstated by 331.8% and earnings per share was overstated by 330%.

| | Three Months Ended April 30, 2014 | | | Three Months Ended April 30, 2013 | | |
|---|---|---|---|---|---|---|
| | As reported | Adjustments | Restated | As reported | Adjustments | Restated |
| Net sales | 194,894 | — | 194,894 | 166,336 | — | 166,336 |
| Cost of sales | 175,917 | 85 | 176,002 | 154,800 | 61 | 154,861 |
| Gross margin | 18,977 | (85) | 18,892 | 11,536 | (61) | 11,475 |
| Selling, general and administrative | 9,111 | 34 | 9,145 | 7,991 | 24 | 8,015 |
| Contingent consideration related to RFG acquisition | — | 7,036 | 7,036 | 199 | 1,926 | 2,125 |
| Operating income (loss) | 9,866 | (7,155) | 2,711 | 3,346 | (2,011) | 1,335 |
| Interest expense | (292) | — | (292) | (317) | — | (317) |
| Other income, net | 270 | — | 270 | 235 | — | 235 |
| Income (loss) before provision for income taxes | 9,844 | (7,155) | 2,689 | 3,264 | (2,011) | 1,253 |
| Provision (benefit) for income taxes | 3,432 | (1,999) | 1,433 | 1,071 | (292) | 779 |
| Net income (loss) | 6,412 | (5,156) | 1,256 | 2,193 | (1,719) | 474 |
| Add: Net loss attributable to noncontrolling interest | 298 | — | 298 | 20 | 15 | 35 |
| Net income (loss) attributable to Calavo Growers, Inc. | 6,710 | (5,156) | 1,554 | 2,213 | (1,704) | 509 |
| Calavo Growers, Inc.'s net income (loss) per share: | | | | | | |
| Basic | 0.43 | (0.33) | 0.10 | 0.15 | (0.12) | 0.03 |
| Diluted | 0.43 | (0.34) | 0.09 | 0.15 | (0.12) | 0.03 |
| Number of shares used in per share computation: | | | | | | |
| Basic | 15,755 | — | 15,755 | 14,819 | — | 14,819 |
| Diluted | 15,764 | 1,412 | 17,176 | 14,839 | 756 | 15,595 |

16. For the three months ended July 31, 2014 operating income was overstated by 189.9%, net income was overstated by 933.7% and earnings per share were overstated by 920%.

| | Three Months Ended July 31, 2014 | | | Three Months Ended July 31, 2013 | | |
|---|---|---|---|---|---|---|
| | As reported | Adjustments | Restated | As reported | Adjustments | Restated |
| Net sales | 218,702 | — | 218,702 | 194,943 | — | 194,943 |
| Cost of sales | 197,757 | 769 | 198,526 | 176,865 | 181 | 177,046 |
| Gross margin | 20,945 | (769) | 20,176 | 18,078 | (181) | 17,897 |
| Selling, general and administrative | 9,431 | 307 | 9,738 | 8,349 | 72 | 8,421 |
| Contingent consideration related to RFG acquisition | — | 23,249 | 23,249 | 357 | 2,974 | 3,331 |
| Operating income (loss) | 11,514 | (24,325) | (12,811) | 9,372 | (3,227) | 6,145 |
| Interest expense | (220) | — | (220) | (293) | — | (293) |
| Gain on deconsolidation of FreshRealm | 12,622 | — | 12,622 | — | — | — |
| Other income, net | 120 | — | 120 | 209 | — | 209 |
| Income (loss) before provision for income taxes | 24,036 | (24,325) | (289) | 9,288 | (3,227) | 6,061 |
| Provision (benefit) for income taxes | 8,064 | (9,844) | (1,780) | 3,163 | 636 | 3,799 |
| Net income (loss) | 15,972 | (14,481) | 1,491 | 6,125 | (3,863) | 2,262 |
| Add: Net loss attributable to noncontrolling interest | 60 | — | 60 | 274 | 136 | 410 |
| Net income (loss) attributable to Calavo Growers, Inc. | 16,032 | (14,481) | 1,551 | 6,399 | (3,727) | 2,672 |
| Calavo Growers, Inc.'s net income (loss) per share: | | | | | | |
| Basic | 1.02 | (0.92) | 0.10 | 0.43 | (0.25) | 0.18 |
| Diluted | 1.02 | (0.93) | 0.09 | 0.43 | (0.26) | 0.17 |
| Number of shares used in per share computation: | | | | | | |
| Basic | 15,760 | — | 15,760 | 14,848 | — | 14,848 |
| Diluted | 15,769 | 1,898 | 17,667 | 14,870 | 946 | 15,816 |

17. On the January 15, 2015 news of the restatement and lack of internal controls, shares of Calavo fell $4.72 per share, or over 9%, to close at $43.07 per share on January 15, 2015 and another 9% on the next day, dropping to $40.17 as the news was absorbed into the market, indicative of the amount by which investors had overpaid for their shares, and the damages they sustained.

18. The Defendants benefitted from the material misstatements by being

able to report profits during a period of uncertainty regarding production of California avocados due to the California drought, which began in 2011and hit the driest spell in 2013. In January 2014, the California Governor declared a drought emergency.[1] The three year period the Company was cooking the books coincided with the drought and its negative impact on the production of avocados in California.

19. For 2013 and the first three quarters of 2014, Calavo would have had a large operating and net loss rather than showing a profit. The inflated financials allowed the Company to beat analyst estimates rather than falling short, which caused the price of Calavo common stock to be inflated.

20. The Individual Defendants directly benefitted from their misconduct, reaping huge bonuses and compensation packages for reporting inflated financial results. Throughout the Class Period Defendants Cole and Bruno were "eligible to receive performance-based compensation upon the achievement of specified performance goals. During the 2014 fiscal year, the performance-based goal was based upon our net income. For [Cole and Bruno], the Compensation Committee provided that the executive officer would receive a percentage of [Calavo's] net income if we achieved a threshold net income of $16,000,000." Proxy Statement, DEF. 14A at 25, filed March 2, 2015. It is not a coincidence that the fraud committed here inflated net and operating income—the very metric used to determine the Individual Defendants' bonuses. For 2014, the percentage of net

[1] http://www.usatoday.com/story/weather/2014/01/17/california-drought-emergency/4581761/

income that Cole and Bruno were entitled to receive as a performance-based bonus was as follows:

| Executive Officer | Net income: $16M-$17M, bonus percent of net income: | Net income: $17M-$18M, bonus percent of net income: | Net income: $18M-$19M, bonus percent of net income: | Net income: $19M-$20M, bonus percent of net income: | Net income: $20M-$21M, bonus percent of net income: | Net income: $21M-$22M, bonus percent of net income: | Net income: $22M-$23M, bonus percent of net income: | Net income: $23M & above bonus percent of net income: |
|---|---|---|---|---|---|---|---|---|
| Lecil Cole | 3.50% | 4.00% | 4.50% | 5.00% | 5.50% | 6.00% | 6.50% | 7.00% |
| Arthur Bruno | 1.25% | 1.60% | 1.95% | 2.30% | 2.65% | 3.00% | 3.35% | 3.70% |

21. Upon disclosure of Defendants' wrongful acts and omissions, the price of Calavo common stock declined precipitously, which caused Plaintiffs and other Class members to suffer significant losses and damages.

## JURISDICTION AND VENUE

22. The claims asserted herein arise under, and pursuant to, §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

24. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

25. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities

of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

**Plaintiffs**

26. Lead Plaintiff Sherif E. El Dabe purchased shares of Calavo common stock based on the Company's materially untrue and misleading financial statements at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

27. Lead Plaintiff John O'Hanlon purchased shares of Calavo common stock based on the Company's materially untrue and misleading financial statements at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

28. Lead Plaintiff Elliot C. Nelms purchased shares of Calavo common stock based on the Company's materially untrue and misleading financial statements at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

**Defendants**

29. Defendant Calavo markets and distributes avocados, prepared avocados, and other perishable foods to food distributors, produce wholesalers, supermarkets, convenience stores, and restaurants worldwide. Calavo was founded in 1924, is headquartered in Santa Paula, California, and trades on the NASDAQ under the ticker symbol "CVGW."

30. Defendant Lecil E. Cole ("Cole") served as the Company's Chairman of the Board, President, and Chief Executive Officer("CEO") during the Relevant Period.

31. Defendant Arthur Bruno ("Bruno") served as the Company's Chief Operations Officer, Chief Financial Officer("CFO") and Corporate Secretary during the Relevant Period.

32. Defendants referenced above in ¶¶30-31 are sometimes referred to herein, collectively, as the "Individual Defendants."

33. Defendant Egidio (Gene) Carbone ("Carbone") was at all relevant times, Chairman of the Audit Committee. Carbone served as Vice-President, Finance, and Corporate Secretary for Calavo from 1980 to 2002. He was also an active Certified Public Accountant ("CPA") from 1967 to 2002 in the State of California and has taught accounting and finance at the college level. He has served as a member of the board of directors of the California Avocado Commission from 2008 to present.

34. Defendant George H. Barnes ("Barnes") was at all relevant times a member of the Audit Committee. Barnes has owned and operated avocado groves since 1988 and has served as a member of the California Avocado Commission for eight years.

35. Defendant Michael A. DiGregorio ("DiGregorio") was at all relevant times a member of the Audit Committee. DiGregorio spent the past 30 years in senior financial and operating capacities in domestic and international markets. A

CPA by background, he has been CFO of public and private companies, and also a president of two large organizations.

36. Defendant Steven Hollister ("Hollister") was at all relevant times a member of the Audit Committee. Hollister is a Managing Member of Rocking Spade, LLC, as a diversified investor and developer, with interests in ranching, vineyards and commercial properties. Mr. Hollister served as Vice President of Sunrise Mortgage & Investment Company, a commercial mortgage broker, from 2006 to 2013. Additionally, Mr. Hollister served as Chief Operating Officer of Fess Parker Winery & Vineyard and Santa Barbara County Wine Center from 2002 to 2006. In addition, Mr. Hollister was Senior Vice President of Central Coast Farm Credit for 17 years.

37. Defendant John M. Hunt ("Hunt") was at all relevant times a member of the Audit Committee. Hunt has served as the General Manager of Embarcadero Ranch since 1982, where he manages a 400-acre avocado and citrus ranch.

38. The Board determined that Defendants Carbone and DiGregorio were audit committee financial experts as defined by SEC rules and applicable listing standards.

39. Defendants Carbone, Barnes, DiGregorio, Hollister and Hunt are referred to herein as the "Audit Committee Defendants."

40. The Audit Committee Defendants served on Calavo's Audit Committee of the Board of Directors throughout the Class Period, and were responsible for, *inter alia*: (i) reviewing and discussing the audited financial statements of the Company with management, including the Quarterly reports filed

with the SEC; and (ii) reviewing with management and the independent auditor the adequacy and effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting

41. Calavo, the Individual Defendants, and the Audit Committee Defendants are referred to herein, collectively, as the "Defendants."

42. Defendant E&Y is an accounting firm that at all relevant times provided accounting services to Calavo. E&Y audited Calavo's books and records, and rendered opinion letters stating that its annual financial statements, filed with the SEC, conformed with GAAP; and that E&Y's audits thereof were conducted in conformance with the Public Company Accounting Oversight Board ("PCAOB") and Generally Accepted Auditing Standards ("GAAS").

## SUBSTANTIVE ALLEGATIONS

### Background

43. Calavo procures and markets avocados and other perishable commodities. The Company operates its business through three segments: Fresh Products, Calavo Foods, and Renaissance Food Group. The Fresh Products segment includes all operations that involve the distribution of avocados and other fresh produce products. The Calavo Foods segment represents all operations related to the purchase, manufacturing, and distribution of prepared products, such as guacamole. The Renaissance Food Group segment represents all operations related to the manufacturing and distribution of fresh-cut fruit, ready-to-eat vegetables, recipe ready vegetables and deli meat products.

44. Avocados are an increasingly in-demand product in the United States. Calavo is one of the largest suppliers of avocados in the United States, which sources avocados from California, Mexico, and Chile. As of February 2014, Avocados made up about 60% of the Company's sales. In addition to selling whole avocados, Calavo also processes them into other products from pulp to guacamole, so its reliance on avocados is heavier than the 60% figure above suggests.

45. In fiscal 2013, Calavo estimated that it handled 30% of all of the avocados grown in the state.

46. Like all farm related business, however, Calavo is subject to the vagaries of weather and climate, which, during the Class Period meant that it suffered from the on-going drought in California. In 2014, coinciding with the Class Period, California experienced its worst dry spell on record. Whitney Irick, *California Drought: Frequently Asked Questions*, NBC Los Angeles, available at http://www.nbclosangeles.com/news/local/Drought-California-Drought-Weather-Water-Conservation-250398291.html.

47. This extreme drought affected avocado farmers because "[i]t takes 74 gallons of water to produce one pound of avocados—and drought-stricken California produces 95 percent of the avocados grown in the United States." Padma Nagappan, *Kiss Your Guacamole Good-Bye: Drought-Stricken California Farmers Stop Growing Avocados*, Take Part, available at http://www.takepart.com/article/2014/11/03/kiss-your-guacamole-goodbye-california-farmers-stop-growing-avocados.

48. In 2014 there was much concern regarding the drought's effect on agribusiness. On July 15, 2014 just before the start of the Class Period, the Wall Street Journal stated, "California's drought will cost the state $2.2 billion this year in losses and added expenses for its giant agriculture industry, while cutting 17,100, or 3.8%, of the state's farm jobs." Jim Carlton, *California Drought Will Cost $2.2 Billion in Agriculture Losses This Year*, The Wall Street Journal, available at http://www.wsj.com/articles/drought-will-cost-california-2-2-billion-in-losses-costs-this-year-1405452120.

49. The Drought resulted in a steady decrease in the amount of California avocados sold by Calavo. In 2014, Calavo sold almost *half* as many California avocados as it did the prior year.

| | 2014 | 2013 |
|---|---|---|
| lbs. of CA avocados sold | 74,438 | 141,400 |
| lbs. non-CA avocados sold | 258,940 | 218,244 |
| lbs. processed avocados sold | 26,451 | 21,636 |

**RFG ACQUISITION**

50. RFG was a leader in the fast-growing refrigerated fresh packaged goods category, which added a broad product line-up under the Garden Highway and Chef Essentials brands to Calavo's existing product line.

51. On May 25, 2011 Calavo acquired 100 percent ownership in RFG. Pursuant to the RFG Acquisition Agreement, Calavo paid approximately $16

million to RFG in a combination of cash and shares of unregistered Calavo common stock. The transaction, which closed in June 2011, was for a combination of cash and stock, including maximum Earn-Out payments of $84 million based on financial performance.

52. Pursuant to the RFG Acquisition Agreement, if RFG's operating results exceeded defined thresholds, additional purchase consideration was required to be paid by the Company, subject to a ceiling, in the form of both cash and Calavo stock. Calavo agreed to pay RFG additional consideration in two stages, as defined in the RFG Acquisition Agreement, of up to an additional $84 million if RFG attains specified financial goals for certain 12-month periods prior to the fifth anniversary of the closing date. The additional payments were to be paid in a combination of cash and unregistered common stock shares, with a fixed price of $23.00 per share.

53. The RFG Acquisition Agreement is clear in defining that the "Merger Share Value" to be used was fixed at $23 per share of Common Stock. Therefore, the Company knew or should have known that the Earn-Out payment was not indexed to its own common stock.

**<u>GAAP VIOLATIONS</u>**

54. Specifically, in the 12 month period following the RFG acquisition, RFG's operating results exceeded the defined thresholds in accordance with the Earn-Out provisions in the RFG Acquisition Agreement. As a result, the Company was required to, and did, make the maximum Earn-Out payments pursuant to the RFG Acquisition Agreement. Initially, Calavo recorded this additional contingent

consideration as an equity instrument and, therefore, did not record expense based on the changes in fair value of the contingent consideration. The Company has now admitted, however, that the contingent consideration should have been accounted for as a liability, requiring re-measurement to fair value and expense recognition, which Calavo was to treat as an amortization expense, at each reporting period subsequent to the acquisition.

**The Company's Improper Accounting for Contingent Consideration**

55. While Defendants properly treated the future Earn-Out payment as a contingent consideration, they failed to properly account for the balance sheet classification of the contingent consideration. Once an arrangement is determined to be a contingent consideration, the company must determine if it should be classified as equity or a liability. *ASC 805-30-25-6*. In either case, the acquirer shall recognize the fair value of contingent consideration at the acquisition date as part of the consideration transferred in exchange for the acquiree. *ASC 805-30-25-5*. However, contingent consideration classified as equity does not need to be re-measured to fair value at each reporting date, whereas contingent consideration classified as a liability must be re-measured at each reporting date until the contingency is resolved. For liability classification, any changes in fair value will be recognized in earnings until the contingent arrangement is settled. *ASC 805-30-35-1*.

56. The contingent payment at issue here, to be settled in a combination of stock and cash, needed to be evaluated under ASC 480. Under ASC 480, a financial instrument, such as shares of stock, that embodies an unconditional

obligation that the issuer must or may settle by issuing a variable number of its equity shares shall be classified as a liability if, at inception, the monetary value of the obligation is based solely or predominantly on any one of the following:

> a. A fixed monetary amount [fixed share price] known at inception (for example, a payable settleable with a variable number of the issuer's equity shares)
>
> b. Variations in something other than the fair value of the issuer's equity shares (for example, a financial instrument indexed to the Standard and Poor's S&P 500 Index and settleable with a variable number of the issuer's equity shares)
>
> c. Variations inversely related to changes in the fair value of the issuer's equity shares (for example, a written put option that could be net share settled). *ASC 480-10-25-14.*

57. In the case of Calavo, the Company met the first criterion because it was to settle the obligation with a variable number of shares based on the agreed upon Earn-Out schedule in the RFG Acquisition Agreement. Furthermore, the shares to be provided as part of the Earn-Out payment have been assigned a fixed, per share, value of $23.00. Therefore, Calavo should have accounted for the contingent consideration as a liability and re-measured the liability to fair value at each reporting date.

58. On January 14, 2015, Calavo announced a restatement of their previously issued financial statements. Note 3 of Calavo's Form 10-K filed on January 30, 2015 stated the following:

> In connection with the preparation, review and audit of the Company's consolidated financial statements required to be included in its Annual Report on Form 10-K for the fiscal year ended October 31, 2014, the Company identified a non-cash misstatement in its historical consolidated financial statements related to its treatment of

> contingent consideration resulting from the acquisition of RFG in June 2011. In accordance with the Earn-Out provisions in the RFG acquisition agreement, if RFG's operating results exceeded defined thresholds, additional purchase price was required to be paid by the Company, subject to a ceiling. RFG's results substantially exceeded defined thresholds and expectations and, accordingly, RFG's former owners received the maximum Earn-Out payment permitted pursuant to the acquisition agreement.
>
> The total cumulative amount of non-cash operating expense, primarily related to the revaluation of RFG Earn-Out liability, that needed to be recorded was approximately $88.1 million, accounted for over the period from the date of acquisition of RFG (i.e. June 1, 2011) through the period ended October 31, 2014. Initially, we recorded the contingent consideration, which was settleable [sic] in common stock, as an equity instrument and therefore did not record expense based on the changes in fair value of the contingent consideration. However, the contingent consideration should have been accounted for as a liability requiring remeasurement to fair value. Additionally, certain amounts of the consideration have been recorded as compensation expense.

59. Calavo's footnote disclosures between first quarter of fiscal year 2012 through third quarter of fiscal year 2014 demonstrate that the Company appeared to have adjusted in each quarter for only a small portion of the change in fair value to be paid in accordance with the RFG Acquisition Agreement; however, the majority of the change in fair value was not adjusted for at each reporting date.

**<u>Requirements for Equity Classification</u>**

60. In most scenarios, contingent considerations are recorded as a liability on the balance sheet because, in order for a contingent consideration to qualify for equity classification, there are stringent criteria and multiple levels of requirements that must be met. In order to get to equity classification, the contingent

consideration must not meet the definition of a liability under ASC 480. If the arrangement does not meet the definition of a liability under 480, a company would then need to determine if the contingent consideration is considered to be indexed against an entity's own stock under ASC 815-40-15. If an arrangement is determined to be indexed to the issuer's own stock, it then needs to be evaluated under ASC 815-40-25. To be classified as equity, ALL of the following conditions must met:

- The arrangement permits settlement in unregistered shares.
- The issuer has sufficient authorized, unissued shares to settle the arrangement, after taking into consideration all other commitments requiring issuance of the same series of shares during the full period the arrangement could remain outstanding.
- The arrangement includes an explicit limit on the number of shares necessary for settlement.
- The issuer is not required to make any cash payments to the seller in the event the issuer fails to timely file with the SEC.
- The arrangement does not contain any cash-settled "top off" or "make whole" provisions.
- The arrangement does not provide the seller with rights that rank higher than those of the issuer's shareholders.
- The arrangement does not require the issuer to post collateral under any circumstances.

61. In summary, if an entity determines than an arrangement either is not indexed to the entity's own stock or fails to meet any of the criteria for equity classification as listed in ASC 815-40, then the arrangement must be classified as a liability. As the criteria for equity classification is so rigorous and inflexible, this should have raised a red flag within the financial reporting group, especially the CFO, Defendant Bruno, and Calavo's auditors, E & Y. This matter should have been critically reviewed by all relevant levels within the financial reporting group

and at E&Y to ensure that the accounting for the Earn-Out payment was in compliance with GAAP.

62. The Company has admitted that the classification did not fall under equity, and that it should have been recorded as a liability from the beginning. There was no room for interpretation of this GAAP regulation.

63. In perpetrating this massive fraud, Defendants improperly accounted for contingent consideration related to treatment of future Earn-Out payments from the RFG contract in violation of GAAP, classifying the payment as an equity instead of a liability; the result of which inflated net income by 1066.5% in 2013; operating income by 463.6% in 2013; and EPS by over 1000% in 2013. The first three quarters of 2014 were also restated. The fraud caused net income in those quarters to be inflated by 325.1%, 331.8% and 933.7% respectively. Operating income for the first three quarters of 2014 was inflated by 240%, 263.9% and 189.9%, respectively. The restated year-to-date nine months ended July 31, 2014 net income totaled $1.3 million, equal to $0.08 per diluted share, which resulted in a misstatement of 1895% and 2025%, respectively.

**<u>Management's Responsibility for its Financial Statements and Internal Controls</u>**

64. In addition to the Defendants' blatant violation of GAAP under a provision that was not subject to interpretation, the Defendants did not have proper internal controls, despite their statements to the contrary.

65. The SEC requires public companies to adhere to, among other things, rules and regulations regarding financial and non-financial reporting and

disclosures. These rules are set forth in the Securities Act of 1933 and the Securities Exchange Act of 1934 and regulations promulgated thereunder. Specifically, Regulation S-X sets forth the form and content requirements for financial statements to be filed with the SEC. As a public company bound by this regulation, Calavo is required to file annual and quarterly reports with the SEC on Forms 10-K and 10-Q,[2] which includes its financial statements prepared in conformity with GAAP. Management's responsibility to prepare accurate and reliable financial statements in conformity with GAAP is acknowledged in a set of standards known as Generally Accepted Auditing Standards ("GAAS").[3] GAAS outlines the responsibilities of an auditor, but also explains that management is responsible for its own financial reporting:

> **The financial statements are management's responsibility**. The auditor's responsibility is to express an opinion on the financial statements. ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of***

---

[2] Section 13(a) of the Exchange Act and Rule 13a-1 lays out these requirements for all issuers with securities registered under Section 12 of the Exchange Act.

[3] As a result of the passage of the Sarbanes-Oxley Act of 2002, auditing standards to be used in the performance of, and reporting on, audits of the financial statements of public companies were thereafter established by the Public Company Accounting Oversight Board ("PCAOB"). The PCAOB initially adopted, as its interim standards, the AICPA Codification of Statements on Auditing Standards that were in existence on April 16, 2003. Sections of the Codification are referenced with the prefix "AU."

***management's responsibility***. [Emphasis added; footnote omitted.][4]

66. In addition, SEC registrants are required to maintain accurate books and records, as well as an adequate system of internal controls, to ensure that their financial statements are prepared in accordance with GAAP.[5] A system of internal control helps management[6] achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. Furthermore, "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record or account …"[7]

67. Calavo was required to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with GAAP. Section 13(b) 2 of the Securities and Exchange Act of 1934 entitled *Periodical and Other Reports* states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A. make and keep books, records, and accounts, which, in reasonable

---

[4] AU § 110.03.

[5] Section 13(b)(2) of the Securities and Exchange Act of 1934, *Periodical and Other Reports*.

[6] Accounting literature defines management as "persons who are responsible for achieving the objectives of the entity and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policy making functions. Persons without formal titles also may be members of management." *See* Accounting Standards Codification 850-10-20.

[7] §13(b)(5) of the Securities and Exchange Act of 1934.

detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that--

   i. transactions are executed in accordance with management's general or specific authorization;

   ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

   iii. access to assets is permitted only in accordance with management's general or specific authorization; and

   iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

68. As described herein, Calavo disclosed a material weakness in its internal controls. On January 30, 2015, in its Form 10-K for the year ended October 31, 2014, the Company disclosed the following:

> With the participation of the Chief Executive Officer and Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in the 1992 “Internal Control—Integrated Framework,” issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of October 31, 2014, our internal controls over financial reporting were not effective due to a material weakness in our controls over our accounting for contingent consideration as such applies to business combinations.
>
> As of October 31, 2014, there was a material weakness in the Company’s controls over its accounting for and reporting of contingent consideration as such applies to business combinations. Specifically, our controls did not properly identify the failure to apply generally accepted accounting principles with respect to what

> qualifies as an equity instrument vs. a liability instrument in a business combination. Initially, we recorded the contingent consideration, which was settleable in common stock, as an equity instrument and therefore did not record expense based on the changes in fair value of the contingent consideration. However, the contingent consideration should have been accounted for as a liability requiring re-measurement to fair value. As a result, material errors to the recorded contingent consideration occurred and were not timely detected.

69. As a result of the misstatement in connection with its accounting for its Earn-Out payment, management identified a material weakness in the design and operation of the Company's controls over its accounting for contingent consideration in connection with business combinations. PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That is Integrated with An Audit of Financial Statements* ("AS 5") states that a company's internal controls are not considered to be effective if one or more material weaknesses exist. [*AS 5 ¶ 3*]. A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, that creates "a **reasonable possibility** that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." [*AS 5-Appendix A7*](emphasis supplied).

70. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in the aforementioned SEC regulations.

71. Calavo's management assessed the effectiveness of its internal control over financial reporting throughout the Class Period. In making its assessment of

internal control over financial reporting, Calavo's management should have used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission Report, *Internal Control – Integrated Framework* (1992) ("COSO Report").[8] The COSO Report, borrowing from GAAS, defines fair presentation as having the following attributes:

> - The accounting principles selected and applied have general acceptance,
> - The accounting principles are appropriate in the circumstances,
> - The financial statements are informative of matters that may affect their use, understanding, and interpretation,
>
> * * *
>
> - The financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements. [Footnote omitted.][9]

72. By treating the Earn-Out payment as equity as opposed to a liability, Calavo's management failed to use accounting principles that were appropriate in the circumstances; and thus, issued financial statements that were not fairly presented.

73. The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives.[10] The five

---

[8] The COSO report was originally issued in September 1992 as a four-volume set. An *Addendum to Reporting to External Parties* was issued in May 1994. On May 14, 2013 COSO released an updated version of the entire framework. Unless otherwise noted, all references to the COSO report refer to the 1992 issuance.

[9] COSO Report, Risk Assessment, pg. 35.

[10] COSO Report, Executive Summary.

components include the Control environment, Risk assessment, Control activities, Information and communication and Monitoring. Calavo clearly had a poor control environment and violated the monitoring components of COSO. Ongoing monitoring includes regular management and supervisory activities as well as specific review processes and procedures to ensure internal controls are designed and operating effectively.

74. A control environment, often referred to as the "tone at the top," describes the atmosphere in which people carry out their daily responsibilities. The Board of Directors and Chief Executive Officer sets the "tone at the top" that establishes a positive control environment and affects the integrity and ethics of employees within the Company. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business. Senior managers, in turn, assign responsibility for establishment of more specific internal control policies and procedures to personnel responsible for the unit's functions. As such, the key management of an organization with respect to an effective internal control system includes not only the CEO, CFO, and the controller or chief accounting officer, but also senior managers and managers at various subsidiaries and divisions.

75. COSO identified several components of the control environment:

> Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.[11]

[11] COSO Report, Executive Summary.

76. Calavo had a poor control environment whereby it was clear that upper management lacked the requisite amount of integrity, ethical values and competence of what was required from employees of a public Company. For example, it was reported that a misstatement in Calavo's Form 10-K for the year ended October 31, 2011, whereby the balance sheet was reportedly overstated by approximately $1 million, was allowed to remain on its books despite the Assistant Controller bringing the accounting error to the attention of the Calavo Controller, James Snyder; the CFO, Defendant Bruno; and Calavo's Director of Human Resources.[12] This type of behavior shows that upper management exhibited total disregard for the accuracy of its published financial statements and that its control environment was not conducive to providing a foundation for strong internal controls.

77. On January 15, 2015 an 8-K filed by the Company, Calavo admitted that it is management's responsibility to maintain internal controls, and specifically that of Defendants Cole and Bruno, yet the Defendants failed to effectively do so:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Internal control over financial reporting refers to the process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, and effected by our Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with

---

[12] *Sedo v. Calavo Growers, Inc.*, Ca. Super. Ct., Ventura County, Case No. 56-2015-00463028-CU-WT-VTA.

> generally accepted accounting principles. With the participation of the Chief Executive Officer and Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in the 1992 "Internal Control—Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of October 31, 2014, our internal controls over financial reporting were not effective due to a material weakness in our controls over our accounting for contingent consideration as such applies to business combinations.

78. Calavo's accounting department only consisted of about four to five people which included a controller, an assistant controller and two or three others. The accounting for the Earn-Out payment would have been prepared and evaluated most-likely by the CFO himself.

79. In connection with the accounting for the Earn-Out payment, there was clearly a lack of effective monitoring by the CFO, Defendant Bruno, to ensure that the transaction was recorded properly. The recording of the transaction as equity, as opposed to a liability, should have been a large red flag that Defendant Bruno should have thoroughly investigated to ensure that the accounting was proper.

**Audit Committee Responsibility**

80. According to the Company's Audit Committee Charter dated October 31, 2013, The Audit Committee's authority and responsibilities required, *inter* alia, the following:

- Prepare the annual report of the Audit Committee that is required by the SEC's rules to be included in the Company's proxy statement.

- Evaluate the qualifications, performance and independence of the independent auditor, including considering whether the auditor's quality controls are adequate and whether the provision of permitted non-audit services is compatible with maintaining the auditor's independence and including a review of all relationships between the independent auditor and the Company.

- Evaluate qualifications and performance of the internal audit team members. Review and concur in the appointment, replacement, reassignment, or dismissal of the internal audit team members.

- Meet with the independent auditor prior to the annual audit to discuss the scope, timing, cost and staffing of the audit, and discuss the results of the annual audit with the independent auditor. Consider the effective use of internal audit resources and address the coordination of efforts between internal and external auditors to ensure the completeness of coverage and reduction of redundant efforts.

- Review and discuss with management and the independent auditor the Company's annual financial statements, the disclosures relating to management's discussion and analysis of financial condition and results of operations in the Annual Report on Form 10-K and any certification, report or opinion rendered by the independent auditor, prior to the filing of each such report with the SEC. Recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

- Review and discuss with management and the independent auditor the Company's quarterly financial statements, and disclosures relating to management's discussion and analysis of financial condition and results of operations, prior to the filing of each Quarterly Report on Form 10-Q with the SEC. As appropriate, review and discuss with management and the independent auditor (a) the Company's earnings releases prior to their dissemination, (b) any Company policies and practices with respect to the dissemination of earnings forecasts and earnings guidance, (c) any material financial or non-financial arrangements of the Company that do not appear in the Company's financial statements, and (d)

material pending legal proceedings and other material contingent liabilities.

- Review with the independent auditor the auditor's judgments about the quality and appropriateness of the Company's accounting principles as applied in the Company's financial reporting. Discuss with management and the independent auditor, together and in separate executive sessions, quality of earnings, significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles and any issues as to the adequacy of the Company's internal control over financial reporting.

- Periodically review with management and the independent auditor the adequacy and effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, including any significant deficiencies in those areas and including any recommendations offered by such persons for improvement.

- Review with management and internal audit: significant findings on internal audits during the year and management's responses; any difficulties the internal audit team encountered in the course of their audits, including any restrictions on the scope of their work or access to required information, and any changes required in the scope of their internal audit.

- Review with management, internal audit and the independent auditor the adequacy of the Company's internal controls, including computerized information system controls and security and any related significant findings and recommendations of the independent auditors and internal audit services and management's responses

- Discuss with, or obtain reports from, management confirming that the Company is in compliance with applicable requirements relating to financial and accounting matters. Review with management significant internal audit finding and management's responses.

- Review and establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding

accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by employees and external parties of concerns regarding questionable accounting or auditing matters.

- Annually, review and approve the enterprise-wide risk assessment and the internal controls work plan prepared by internal audit for the upcoming year.

81. The Defendants admit that the Audit Committee is responsible, with management, in overseeing the Company's financial statements and ensuring their accuracy, as stated in the 2014 proxy:

> The Audit Committee assists the Board and management in fulfilling their responsibilities for generally overseeing our financial reporting processes and the audit of our financial statements, including the integrity of our financial statements, our compliance with legal and regulatory requirements, the qualifications and independence of the independent registered public accounting firm, the performance of our internal audit function and the independent registered public accounting firm, and risk assessment and risk management. Among other things, the Audit Committee prepares the Audit Committee report for inclusion in the annual proxy statement; appoints, evaluates and determines the compensation of the independent registered public accounting firm; reviews and approves the scope of the annual audit, the audit fee and the financial statements; reviews our disclosure controls and procedures, internal controls, internal audit function, and corporate policies with respect to financial information and earnings guidance; oversees investigations into complaints concerning financial matters; reviews other risks that may have a significant impact on our financial statements; and reviews transactions with related persons. The Audit Committee works closely with management as well as the independent registered public accounting firm.

82. In 2014, the Audit Committee met six times, yet failed to uncover the most basic treatment of Earn-Out consideration. The Audit Committee did not comply with its stated duties and responsibilities, as set forth *supra*.

**<u>Confidential Witnesses</u>**

83. Confidential Witness Number 1 ("CW 1") was the Assistant Controller of Calavo from May 2006 until September 2011. CW 1 reported to the Controller, James Snyder. CW 1 stated that Calavo's accounting department only consisted of about four to five people, which included a controller, an assistant controller, and two or three others. CW 1 indicated that CW 1 was responsible for inventory accounting, managing accounts payable, and receivables for consigned commodities.

84. CW 1 stated that the accounting group had a committee meeting at the end of each month. The meetings consisted of four to five people, including the Controller, and CFO of the Company. During the meetings, the accountants discussed "adjusting journal entries" for each division and made sure the books were accurate. Everyone at these meetings reviewed the accounting records to ensure their accuracy.

**Materially False and Misleading**
**<u>Statements Issued During the Period</u>**

85. On the first day of the Class Period, September 9, 2014, Calavo announced the fiscal 2014 third quarter results through a press release. The press release stated:

> Calavo Growers, Inc. (Nasdaq-GS: CVGW), a global avocado-industry leader and expanding provider of value-added fresh food, today reported record fiscal 2014 third-quarter results, with net income from recurring business operations rising to a new historic high for any single period in company history and all other key metrics reaching unprecedented levels. The record net income from recurring operations eclipses the previous all-time high set in the immediately prior quarter, according to the company.

86. This statement was false and misleading because net income for the third quarter of 2014 was misstated by 933.7%, due to the fact that the Company violated GAAP by not classifying the contingent consideration associated with the acquisition of RFG as a liability but instead as an equity. At the time of this misstatement, the Company knew (1) that the standard for equity classification of a contingent consideration is so rigorous and inflexible that a red flag should have been noted within the financial reporting group; (2) that the contingent consideration was booked as equity, rather than liability, thereby avoiding any negative impact on Calavo's income statement.

87. The press release further stated:

> For the three months ended July 31, 2014, before giving effect to the non-operating gain, net income advanced 31.6 percent to $8.4 million, equal to $0.53 per diluted share, from $6.4 million, or $0.43 per diluted share in the corresponding quarter last year.
>
> ***
>
> Operating income in the fiscal 2014 third quarter grew to $10.7 million, an increase of 14.4 percent from $9.4 million in the like quarter one year ago.

88. This statement was false and misleading because net income for the third quarter of 2014 was misstated by 933.7%, operating income was misstated by 189.9%, and earnings per share were overstated by 920% due to the fact that the Company violated GAAP by not classifying the contingent consideration associated with the acquisition of RFG as a liability, but instead, as an equity. Further, at the time of this misstatement the Company knew (1) that the standard for equity classification of a contingent consideration is so rigorous and inflexible

that a red flag should have been noted within the financial reporting group; (2) that the contingent consideration was booked as equity rather than a liability thereby avoiding any negative impact on Calavo's income statement.

89. The press release further stated:

> For the nine months ended July 31, 2014, before the gain from the FreshRealm deconsolidation, net income rose 68.8 percent to $19.1 million, equal to $1.21 per diluted share, from $11.3 million, or $0.76 per diluted share, in the initial three quarters last year. Including the gain, year-to-date net income totaled $26.7 million, equal to $1.70 per diluted share.

90. These statements were false and misleading because net income for the third quarter of 2014 was overstated by 933.7% and earnings per share was overstated by 920% due to the fact that the Company violated GAAP by not classifying the contingent consideration associated with the acquisition of RFG as a liability but, instead, as an equity. The restated year-to-date nine months ended July 31, 2014 net income totaled $1.3 million, equal to $0.08 per diluted share, which results in a misstatement of 1895% and 2025%, respectively.

91. At the time of this misstatement the Company knew (1) that the standard for equity classification of a contingent consideration is so rigorous and inflexible that a red flag should have been noted within the financial reporting group; (2) that the contingent consideration was booked as equity rather than a liability thereby avoiding any negative impact on Calavo's income statement.

92. The press release stated that operating income for three months ended July 31, 2014 as $11,514,000.00, net income as $16,032,000.00, cost of sales was $197,757,00 as well as the following financial information:

| | Three months ended July 31, 2014 | Three months ended July 31, 2013 | Nine months ended July 31, 2014 | Nine months ended July 31, 2013 |
|---|---|---|---|---|
| Net sales | $ 218,702 | $ 194,943 | $ 581,761 | $ 500,778 |
| Cost of sales | 197,757 | 176,865 | 528,149 | 458,040 |
| Gross margin | 20,945 | 18,078 | 53,612 | 42,738 |
| Selling, general and administrative | 9,431 | 8,706 | 26,814 | 25,717 |
| Operating income | 11,514 | 9,372 | 26,798 | 17,021 |
| Interest expense | (220) | (293) | (768) | (862) |
| Gain on deconsolidation of FreshRealm | 12,622 | - | 12,622 | - |
| Other income, net | 120 | 209 | 525 | 582 |
| Income before provision for income taxes | 24,036 | 9,288 | 39,177 | 16,741 |
| Provision for income taxes | 8,064 | 3,163 | 13,318 | 5,742 |
| Net income | 15,972 | 6,125 | 25,859 | 10,999 |
| Add: Net loss attributable to noncontrolling interest | 60 | 274 | 858 | 320 |
| Net income attributable to Calavo Growers, Inc. | $ 16,032 | $ 6,399 | $ 26,717 | $ 11,319 |
| Calavo Growers, Inc.'s net income per share: | | | | |
| Basic | $ 1.02 | $ 0.43 | $ 1.70 | $ 0.77 |
| Diluted | $ 1.02 | $ 0.43 | $ 1.70 | $ 0.76 |
| Number of shares used in per share computation: | | | | |
| Basic | 15,760 | 14,848 | 15,748 | 14,786 |
| Diluted | 15,769 | 14,870 | 15,756 | 14,807 |

93. These statements were false and misleading because net income for the third quarter of 2014 operating income was misstated by 189.9%, the Company did not have operating income of $11,514,000.00—rather it had a loss of $12,811,000.00 and net income was overstated by 933.7% for an actual amount of $1,551,000.00 due to the fact that the Company violated GAAP by not classifying the contingent consideration associated with the acquisition of RFG as a liability but instead as an equity. At the time of this misstatement the Company knew (1) that the standard for equity classification of a contingent consideration is so rigorous and inflexible that a red flag should have been noted within the financial reporting group; (2) that the contingent consideration was booked as equity rather than a liability thereby avoiding any negative impact on Calavo's income statement.

94. CEO Defendant Cole further stated in the press release:

> Our exceptional capabilities sourcing and selling fresh avocados from Mexico have allowed us to profitably navigate the market-condition headwinds resulting from the limited California fruit volume this year. These factors unquestionably have been a drag on the all-source fruit supply and constrained consumption during the current year. From early indicators and as I have previously stated, we expect to see avocado-industry consumption growth resume in September and October and begin to accelerate in the first half of 2015.

95. The press release further stated the "Diluted EPS from Operations Rises to $0.53—New All-Time High—from $0.43 One Year Ago."

96. These statements were false and misleading because Diluted EPS was materially overstated. EPS was actually only $0.09, rather than $0.53. At the time of this misstatement, the Company knew (1) that the standard for equity classification of a contingent consideration is so rigorous and inflexible that a red flag should have been noted within the financial reporting group; (2) that the contingent consideration was booked as equity, rather than a liability, thereby avoiding any negative impact on Calavo's income statement.

97. The reported 3Q14 Adjusted EPS fell far short of the analyst consensus estimate of $0.46, despite the false positive news that EPS exceeded the analyst consensus estimate of $0.46 by $.08 per diluted share—by over 13%.

98. On this positive news, the Company stock price jumped $4.45, or 11.5%, from $38.65 on September 8, to $43.10 on September 10, 2014.

99. On this same date, the analysts who followed the stock reiterated the misstated numbers and shadowed the positive remarks of the Company. Analysts Brett M. Hundley and Omar J. Mejias, of BB&T Capital Markets, said that Calavo had a "**Solid Q3.** CVGW reported Q3'14 EPS of $0.53 compared to our estimate of

$0.45 and consensus of $0.46. Sales of $218.7M were above our $210M forecast, while gross margin was 15 bps better." Kurt Frederick of Wedbush reported the same numbers the Company reported, and said that the Company had "EPS upside on continued momentum in fresh-cut and vegetable business."

100. On September 10, 2014, Chris Krueger of Lake Street Capital Markets said "Calavo posted strong 3Q2014 results, with EPS of $0.53 easily beating our $0.44 estimate. The Company has effectively managed through the weak California avocado crop and is seeing a boost in sales growth from both its Calavo Foods and RFG segments."

101. On September 15, 2014, the Company filed with the SEC its Form 10-Q for the quarter ended July 31, 2104, which reiterated the Company's previously announced inflated quarterly financial results, was signed by Defendants Cole and Bruno, and contained SOX Certifications signed by Defendants Cole and Bruno.

102. The 10-Q stated the following financials:

| | Three months ended July 31, 2014 | Three months ended July 31, 2013 | Nine months ended July 31, 2014 | Nine months ended July 31, 2013 |
|---|---|---|---|---|
| Net sales | $218,702 | $194,943 | $581,761 | $500,778 |
| Cost of sales | 197,757 | 176,865 | 528,149 | 458,040 |
| Gross margin | 20,945 | 18,078 | 53,612 | 42,738 |
| Selling, general and administrative | 9,431 | 8,706 | 26,814 | 25,717 |
| Operating income | 11,514 | 9,372 | 26,798 | 17,021 |
| Interest expense | (220) | (293) | (768) | (862) |
| Gain on deconsolidation of FreshRealm | 12,622 | — | 12,622 | — |
| Other income, net | 120 | 209 | 525 | 582 |
| Income before provision for income taxes | 24,036 | 9,288 | 39,177 | 16,741 |
| Provision for income taxes | 8,064 | 3,163 | 13,318 | 5,742 |
| Net income | 15,972 | 6,125 | 25,859 | 10,999 |
| Add: Net loss attributable to noncontrolling interest | 60 | 274 | 858 | 320 |
| Net income attributable to Calavo Growers, Inc. | $ 16,032 | $ 6,399 | $ 26,717 | $ 11,319 |
| Calavo Growers, Inc.'s net income per share: | | | | |
| Basic | $ 1.02 | $ 0.43 | $ 1.70 | $ 0.77 |
| Diluted | $ 1.02 | $ 0.43 | $ 1.70 | $ 0.76 |
| Number of shares used in per share computation: | | | | |
| Basic | 15,760 | 14,848 | 15,748 | 14,786 |
| Diluted | 15,769 | 14,870 | 15,756 | 14,807 |

103. These statements were false and misleading because net income for the third quarter of 2014 operating income was misstated by 189.9%, wherein the Company's reported operating income of $11,514,000.00 was actually a loss of $12,811,000.00, and net income was overstated by 933.7% for an actual amount of only $1,551,000.00, due to the fact that the Company violated GAAP by not classifying the contingent consideration associated with the acquisition of RFG as a liability, but instead as an equity. Diluted earnings per share was overstated by $0.93 for an actual amount of $0.09. At the time of these misstatements, the Company knew (1) that the standard for equity classification of a contingent consideration is so rigorous and inflexible that a red flag should have been noted within the financial reporting group; (2) that the contingent consideration was booked as equity rather than a liability, thereby avoiding any negative impact on Calavo's income statement.

104. The 10-Q further stated:

> Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective.

105. These statements were false and misleading because the Company did not have an adequate system of internal controls to ensure that their financial statements were prepared in accordance with GAAP. At the time of the

misstatements, the Company knew or should have known that it had a material weakness in its internal controls because of its egregious mistreatment of the contingent consideration.

106. On September 23, 2014, the Company filed with the SEC a Form 8-K announcing the payment of the Earn-Out provision. The 8-K was signed by Defendant Cole and stated:

> Pursuant to that certain Agreement and Plan of Merger between Calavo Growers, Inc. ("we," "Calavo," or "the Company") and Renaissance Food Group, LLC ("RFG") and Liberty Fresh Foods, LLC, Kenneth Catchot, Cut Fruit, LLC, James Catchot, James Gibson, Jose O. Castillo, Donald L. Johnson and RFG Nominee Trust (collectively, the "Sellers"), as described in our Current Report on Form 8-K filed with the Securities and Exchange Commission on June 1, 2011, and the related Amendments, as described in our Current Reports on Form 8-Ks filed with the Securities and Exchange Commission on September 4, 2013 and November 26, 2013 (collectively, the "Amended Agreement"), we agreed to make Earn-Out payments to the Sellers upon the satisfaction of certain performance requirements specified in the Amended Agreement. The Amended Agreement states that, upon the attainment of the Stage 3 Maximum Earn-Out Trigger, the Company shall be obligated to pay $50,000,000 in Calavo common stock and an additional 434,783 shares of Calavo common stock. The Amended Agreement states that the Stage 3 Maximum Earn-Out Trigger shall be met if, for a trailing 12-month period, three months in a row, (1) the EBITDA for RFG is equal to or greater than $15,000,000 and (2) the Revenue for RFG is equal to or greater than $190,000,000. On October 23, 2014, based on the results of operations to date, the Stage 3 Maximum Earn-Out Trigger was met and we issued 434,783 shares of unregistered Calavo common stock to the Sellers. Additionally, on October 23, 2014, we issued $50,000,000 in unregistered Calavo common stock to a trust for the benefit of the Sellers using the closing stock price on October 23, 2014, which calculated to 1,097,213 shares. We anticipate filing a Form S-3 registration statement that will register the resale of these 1,097,213 shares. The issuance of the shares of common stock described in this Item 3.02 is exempt from registration under the

Securities Act of 1933 by reason of the securities registration exemption contained in Section 4(2) of the Securities Act of 1933 for a transaction by an issuer not involving a public offering.

107. These statements were misleading because they omitted to disclose that they had been recording the contingent liability incorrectly, inflating the financials for the past several reporting periods.

108. On October 31, 2014, Calavo filed a Form S-3 prospectus with the SEC related to the offer and sale from time to time of up to 1,397,213 shares of Calavo common stock by the RFG Nominee Trust. The outstanding shares of Calavo common stock were issued to the RFG Nominee Trust on October 23, 2014 upon the attainment of an Earn-Out target specified in an Agreement and Plan of Merger in May, 2011.

109. The Form S-3 specifically incorporated by reference the Form 10-K for the fiscal year ended October 31, 2013, filed with the SEC on January 13, 2014, as well as the Form 10-Q for the quarter ended July 31, 2014, filed with the SEC on September 15, 2014. In addition, with the consent of E&Y, the Form S-3 specifically incorporated by reference E&Y's Accounting Report dated January 13, 2014, with respect to the consolidated financial statements, as well as the effectiveness of Calavo's internal controls in the Form 10-K the fiscal year ended October 31, 2013, filed with the SEC on January 13, 2014.

110. On November 12, 2014, Calavo filed a subsequent prospectus as a Form 424B3 which also specifically incorporated by reference the Company's Form 10-K for the year ended October 31, 2013, the Form 10-Q for the quarter ended July 31, 2014, and E&Y's Accounting Report contained in the Form 10-K

for the year ended October 31, 2013 which was self-described as an unqualified opinion on the Company's financials and the effectiveness of the Company's internal controls.

111. The financial statements contained in the Form 10-K for the year ended October 31, 2013, and the Form 10-Q for the quarter ended July 31, 2014 were materially false and misleading because net income was inflated by 1066.5% in fiscal 2013; operating income inflated by 463.6% in 2013; and EPS inflated by over 1000% in 2013. Net income was inflated in the first three quarters of fiscal 2014 by 325.1%, 331.8% and 933.7% respectively. Operating income for the first three quarters of 2014 was inflated by 240%, 263.9% and 189.9%. EPS was inflated during the third quarter by 327.3%, 330% and 920%, respectively.

112. Moreover, E&Y's unqualified opinion regarding the financials was materially false and misleading, as evidenced by the improper accounting for the RFG Earn-Out payment and the inflated net income, operating income, and EPS contained in the financials. Further, E&Y's statement regarding the effectiveness of the Calavo's internal controls was also materially false and misleading as evidenced by, *inter alia*, the material weaknesses in the Company's accounting department and systems which allowed the egregious and obvious mistreatment of the accounting for the RFG Earn-Out payment.

113. As a result of the foregoing material misstatements related to the state of the Company's financials and its internal controls, Calavo's earnings and stock prices were materially inflated during the Class Period. In direct response, the

Company's stock price soared to as high as $47.97 per share during the Class Period.

**DEFENDANT E&Y'S FRAUDULENT AUDIT OPINIONS**

114. Defendant E&Y served as Calavo's independent auditor during the Relevant Period. E&Y acted in that capacity pursuant to the terms of engagement letters with Calavo which required E&Y, among other things, to audit the Company's financial statements in accordance with GAAS and the standards promulgated by the PCAOB, and to report the results of those audits to Calavo, its Board of Directors and the investing public.

115. E&Y performed audits of the consolidated financial statements of Calavo for its fiscal years ended October 31, 2014, 2013 and 2012. For each of these years, E&Y issued a Report of Independent Registered Public Accounting Firm ("Accounting Report"), in which it stated that its audits of Calavo's financial statements had been conducted in accordance with PCAOB standards, and that Calavo's consolidated financial statements conformed to GAAP.

116. Defendant E&Y knew or should have known from its audits of Calavo's financial statements, reviews of Calavo's financial controls, and discussions with Calavo management and Calavo internal auditors, that Calavo was not properly accounting for the Earn-Out payments related to the acquisition of RFG as expenses on Calavo's income statements pursuant to ASC 480, but instead, burying these charges in "shareholder equity", which is an item on the balance sheet, below the line of net assets and liabilities.

117. Nonetheless, for each of the relevant annual statements referenced herein, Defendant E&Y fraudulently issued an unqualified audit opinion.

118. Calavo materially distorted its performance reporting profits of $ 74.9 million for 2012, 2013 and the first nine months of fiscal 2014, when, in fact, proper accounting for the RFG Earn-Out payment would have wiped out the majority of its reported profits for most of those periods. Despite this outright misrepresentation, E&Y consented to the incorporation by reference of Accounting Report dated January 13, 2014, with respect to the consolidated financial statements, as well as the effectiveness of Calavo's internal controls in the Form 10-K filed with the SEC for the fiscal year ended October 31, 2013 and in the S-3 filed by Calavo with the SEC related to the filing of a prospectus on October 31, 2014 related to the RFG acquisition. The references to the Accounting Report were repeated in a subsequent Prospectus filed as a Form 424B3 with the SEC on November 12, 2014. Accordingly, Defendant E&Y is liable for its misrepresentations made in the S-3 and Form 424B3 filed with the SEC during the Class Period. E&Y's consent to incorporate its unqualified audit opinions during the Class Period further defrauded Calavo investors.

**Violations of PCAOB Reporting Standards, General Standards, and Standards of Field Work**

119. E&Y violated PCAOB auditing standards in the conduct of its audit in the following ways:[13]

---

[13] The foundation of the PCAOB standards rest on ten broad standards which provide a measure of audit quality and objectives to be achieved in an audit. These audit standards include three general standards about the qualifications of the auditor, the auditor's independence, and the quality of the auditor's work; three standards of field work about how the audit should be conducted; and four reporting standards about

(a) E&Y violated PCAOB Standard of Reporting No. 1, which requires the auditor to attest to whether the Financial Statements are presented in accordance with GAAP;

(b) E&Y violated PCAOB General Standard No. 3, which requires that due professional care is to be exercised in the performance of the audit and the preparation of the report;

(c) Work is to be adequately planned and assistants, if any, are to be properly supervised;

(d) A sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing and tests to be performed; and

(e) E&Y violated PCAOB Standard of Fieldwork No. 3, which requires that sufficient appropriate evidential matter to afford a reasonable basis for: (1) the opinion regarding the financial statements; (2) the opinion regarding internal controls over financial reporting.

120. The Company has admitted that the financial statements Defendant E&Y certified were materially false.

121. The Form 10-K for the fiscal year ending October 31, 2013, filed with the SEC on January 13, 2014, and incorporated in the S-3 filed with the SEC on October 31, 2014 with the consent of Defendant E&Y stated, in pertinent part:

> We have audited Calavo Growers, Inc.'s internal control over financial reporting as of October 31, 2013, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (1992 Framework) (the COSO criteria). Calavo Growers, Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over

---

the requirements of the auditor's report. (Auditing Standards ("AU") par. 150.01-.02). The PCAOB standards that have been adopted by the PCAOB and approved by the SEC are referenced with the symbol ("AS") in the prefix and for standards that have been adopted by the PCAOB as preexisting interim standards are shown with the symbol ("AU") in the prefix.

Financial Reporting. ***Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.***

***We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

***A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

> ***In our opinion, Calavo Growers, Inc. maintained, in all material respects, effective internal control over financial reporting as of October 31, 2013, based on the COSO criteria.***
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Calavo Growers, Inc. as of October 31, 2013 and 2012, and the related consolidated statements of income, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended October 31, 2013 of Calavo Growers Inc. and ***our report dated January 13, 2014 expressed an unqualified opinion thereon.***

122. E&Y's Accountant's Report attesting to E&Y's performance of its audits in accordance with the standards of the PCAOB, and representing that Calavo's financial statements conformed to GAAP were materially false and misleading when made. The Auditors' Reports were false because:

- E&Y's audits were not conducted in accordance with PCAOB standards;
- Calavo's financial statements did not fairly present the financial position of and results of operations for Calavo for fiscal years represented in the Auditors'' Reports in conformity with GAAP; and
- Calavo's internal controls were not effective but rather had serious material weaknesses that enabled Calavo employees to manipulate the Company's financial reporting to a significant extent. Specifically, Calavo's failure to adequately monitor its internal controls prevented it from taking the necessary corrective actions to stop the improper recording of the RFG Earn-Out payments. As a result, E&Y knew or recklessly disregarded that the system of internal controls had material weaknesses that enabled the financial statements to be materially misstated.

123. By issuing unqualified Auditors' Reports for these years, E&Y violated Statement of Accounting Standard ("SAS") 98 entitled, "Reports on Audited Financial Statements," which states:

> The auditor's standard report states that the financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flow in conformity with generally accepted accounting principles. This conclusion may be expressed only when the auditor has formed such an opinion on the basis of an audit performed in accordance with generally accepted auditing standards.

AU § 508.07.

124. E&Y knew, or recklessly disregarded, the fact that Calavo was manipulating its financial statements by improperly accounting for the RFG Earn-Out payments.

125. Moreover, E&Y knew that the Company was representing to investors that it, in fact, was accounting for the RFG Earn-Out payments in accordance with ASC 480. In so doing, E&Y allowed the Company to report materially misstated expenses, which had the effect of artificially inflating the price of Calavo common stock.

126. Further, E&Y issued Auditors' Reports that – as the Company has admitted -- falsely stated that the Company had no material weaknesses in its internal control structure.

127. Generally Accepted Auditing Standards, or GAAS, are established by the American Institute of Certified Public Accountants ("AICPA"), of which Defendant E&Y is a member. The standards, initially adopted by the PCAOB as interim standards, set the minimum level of performance and quality that auditors are expected, by clients and the public, to achieve. Under GAAS, the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance that the

financial statements are free of material misstatement, whether caused by error or fraud. E&Y repeatedly and materially violated GAAS in each of its audits, failed to properly plan and perform its audits to obtain reasonable assurance that Calavo's financial statements were free of material misstatements, and, therefore, had no basis on which to state that Calavo's financial statements were presented in conformity with GAAP.

128. While E&Y may have had basic knowledge of Calavo's business, organization, and operating characteristics through its experience with the Company, it either knowingly acquiesced in Calavo's fraud or turned a blind eye, and failed to obtain the knowledge necessary to gain an understanding of the accounting processes and internal controls used by Calavo to record the expense for the contingent consideration. AU Section 311, entitled Planning and Supervision, requires that in order to properly plan an audit, an auditor should obtain a level of knowledge of its clients' business sufficient to enable it to "obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements." AU § 311.06. In planning the audit, the auditor also must "consider the methods the entity uses to process accounting information . . . because such methods influence the design of the internal control." AU § 311.09. In connection with planning its audit, E&Y either was aware of the Company's methods which were used to commit fraud, or recklessly failed to obtain sufficient knowledge to evaluate Calavo's accounting and reporting systems and accounting data concerning, inter alia, the RFG Earn-Out payments.

129. E&Y's intentional or reckless lack of understanding is borne out by the fact that Calavo repeated the same violation for more than two years, as early as 2012, which continued until almost the end of the 2014 fiscal year. Moreover, E&Y allowed Calavo to represent to investors that the Company was accounting for the RFG Earn-Out payment in accordance with ASC 480. E&Y was required to know its client's process of accounting for the acquisition costs, which enabled E&Y to plan its auditing procedures to extend or modify its audit testing in the area. AU § 311.03.

130. E&Y was required to base its opinion on evidence obtained during the audit, not the conclusions of management. "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU § 326.02. "[W]ithout adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted." AU § 326.16.

131. E&Y violated the Standard of Fieldwork No. 3 by failing to obtain additional, sufficient, appropriate evidential matter with respect to its audits of Calavo's accounting for the contingent consideration related to the RFG acquisition. GAAS requires that "the evidential matter obtained should be sufficient for the auditor to form conclusions concerning the validity of the individual assertions embodied in the components of financial statements." AU § 326.13. Once E&Y learned that Calavo was accounting for the Earn-Out payments as an equity pursuant to ASC 815-40, instead of correctly as a liability pursuant to

ASC 480, E&Y should have expanded its audit procedures in this area. Furthermore, GAAS is clear that planning continues throughout the audit: "[a]s the audit progresses, changed conditions may make it necessary to modify planned audit procedures." AU § 311.05.

132. GAAS required E&Y to be particularly diligent with respect to unusual quarter-end transactions: Furthermore, GAAS is clear that planning continues throughout the audit: "[T]he auditor should design procedures to test the appropriateness of journal entries recorded in the general ledger and other adjustments (for example, entries posted directly to financial statement drafts) made in the preparation of the financial statements." AU § 316.58. SAS 99. "Specific responses to the auditor's assessment of the risk of material misstatement due to fraud will vary depending upon the types or combinations of fraud risk factors or conditions identified and the account balances, classes of transactions, and assertions they may affect…The following are specific examples of responses…Perform a detailed review of the entity's quarter-end or year-end adjusting entries and investigate any that appear unusual as to nature or amount." AU § 316.29, SAS 82.

133. E&Y violated AU Section 230—*Due Professional Care in the Performance of Work*. E&Y failed to perform its work with the requisite amount of due care. "Due professional care imposes a responsibility upon each professional within and independent auditor's organization to observe the standards of field work and reporting." [AU 230 par. .02] Through the exercise of due care, E&Y was required to obtain reasonable assurance that the financial

statements were free from material misstatement, whether caused by error or fraud. [AU 230.10] E&Y failed to do this.

134. E&Y's reckless disregard, or willful violation, of Generally Accepted Accounting Standards permitted the issuance of the false and misleading financial statements identified herein during the Class Period, and discouraged investors from questioning the accuracy of those statements.

135. E&Y's recklessness is underscored by the fact that it willfully allowed the patently wrong accounting methodology to be employed for almost three years.

**THE TRUTH EMERGES**

136. On January 15, 2015, the Company issued a press release that stated:

> Calavo also will disclose today in a Form 8-K filing with the U.S. Securities and Exchange Commission that it will record a non-cash charge—which the company treats as amortization expense—totaling, over all periods, $88.9 million before tax ($54.0 million net of tax) related to a misstatement in its treatment of contingent consideration in its acquisition of RFG in June 2011. This non-cash misstatement in its historical financial statements relates to equity payments made to the sellers when RFG's operating results exceeded defined thresholds. As previously reported, RFG's results substantially exceeded all performance targets and, accordingly, its former owners received the maximum Earn-Out provided under the acquisition agreement, which was paid in cash and stock. The Company recorded contingent consideration expense related to the acquisition of RFG totaling $54.0 million for fiscal year 2014, as compared to $32.3 million in fiscal 2013, as well as $12.9 million for the fourth fiscal quarter of 2014, as compared to $18.8 million for the fourth fiscal quarter of 2013. There will be no further charges with respect to the RFG acquisition agreement. As point of note, under Calavo ownership RFG revenues have grown from a fiscal 2011 "run rate" of $94.1 million to $252.3 million for the fiscal year ended Oct. 31, 2014. In that same period, RFG EBITDA has risen from $2.6 million to $16.0 million. Initially, Calavo recorded the contingent consideration, which was settleable in common stock, as an equity instrument and, therefore, did not record

expense based on the changes in fair value of the contingent consideration. The company now believes, however, that the contingent consideration should have been accounted for as a liability, requiring re-measurement to fair value and expense recognition, which Calavo is treating as amortization expense, at each reporting period subsequent to the acquisition. Further, all information related to the specifics of payments of the RFG Earn-Out payment has been accurately explained in all of the company's filings and all payments have been accurately settled.

137. In the press release, Defendant Cole stated:

Let me underscore that the contingent consideration liability is a noncash charge. It has no impact on Calavo's cash position whatsoever. Further, the change does not alter either the company's historical or current earnings before interest, taxes, depreciation and amortization (EBITDA) and has no impact on the company going forward. Furthermore, there will be no additional non-cash charges, as this transaction is now completed, and all details of the Earn-Out have been correctly outlined in all SEC filings over the last three-and-a-half years…It is a unique accounting issue related to structuring the purchase with a large Earn-Out component. To that end, we believe that reporting adjusted annual and quarterly net income and adjusted per-share results for these related periods—exclusive of the Earn-Out-specific, non-cash charge as we are doing in this release—provide the most meaningful way to look at the profitability, underlying strength and on-going performance of Calavo's businesses. Finally, it is important to reiterate that the success of the RFG transaction itself triggered this charge, and is a reflection of acquiring that business on risk-averse terms.

138. The Company has now admitted that the contingent consideration should have been accounted for as a liability, requiring re-measurement to fair value and expense recognition, which Calavo will treat as an amortization expense, at each reporting period subsequent to the acquisition—totaling, over all

periods, $88.9 million before tax ($54.0 million net of tax) related to the misstatement in its treatment of contingent consideration.

139. Defendants give no explanation as to why they recorded the Earn-Out payments in equity when they admit that they "substantially" exceeded the defined thresholds, knowing that they were going to have to make the Earn-Out payments, evidenced by the restatement that reclassified the amount recorded in equity to a liability.

140. On this news, the Company's stock price declined $7.62, or 16%, from $47.79 on January 14, 2015 to $40.17 on January 16, 2015.

141. Upon disclosure of Defendants' wrongful acts and omissions, the price of Calavo common stock declined precipitously, which caused Plaintiffs and other Class members to suffer significant losses and damages.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

142. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of a Class consisting of all those who purchased or otherwise acquired Calavo securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have, or had, a controlling interest.

143. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Calavo Class Period, securities of

Calavo were actively traded on the NASDAQ Global Select Market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Calavo, or their transfer agents, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

144. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

145. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

146. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Calavo;
- whether the Individual Defendants, the Audit Committee Defendants and E&Y caused Calavo to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false

and misleading financial statements;

- whether Defendant E&Y violated PCAOB and/or GAAS standards in issuing unqualified opinions of Calavo's financial statements during the Class Period;
- whether the prices of Calavo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

147. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

148. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Calavo securities are traded in efficient markets;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's

securities; and

- Plaintiffs and members of the Class purchased and/or sold Calavo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

149. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

150. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violations of Section 10(b) of**
**The Exchange Act and Rule 10b-5 Against**
**Calavo, the Individual Defendants and E&Y**

151. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

152. This Count is asserted against Calavo, the Individual Defendants, and E&Y, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

153. During the Class Period, Defendants and E&Y engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class;

made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Calavo securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Calavo securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

154. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants and E&Y participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Calavo securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Calavo's finances and business prospects.

155. By virtue of their positions at Calavo and/or work on the Calavo audits, Defendants and E&Y had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby

to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants and E&Y. Said acts and omissions of Defendants and E&Y were committed willfully or with reckless disregard for the truth. In addition, each Defendant and E&Y knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

156. The Individual Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit by meeting certain financial metrics to receive huge bonus packages.

157. Information showing that Defendants and E&Y acted knowingly, or with reckless disregard for the truth, is peculiarly within Defendants' and E&Y's knowledge and control. As the senior managers and/or directors of Calavo, the Individual Defendants had knowledge of the details of Calavo's internal affairs and financial statements. As auditors of Calavo, E&Y had knowledge of the details of Calavo's financial statements and internal controls

158. The Individual Defendants and E&Y are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to, and did, directly or indirectly control the content of the statements of Calavo. As officers and/or directors of a publicly-held Company, and as auditors of the Company's financial

statements, the Individual Defendants and E&Y had a duty to disseminate timely, accurate, and truthful information with respect to Calavo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Calavo securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Calavo's business and financial condition which were concealed by Defendants and E&Y, Plaintiffs and the other members of the Class purchased or otherwise acquired Calavo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and E&Y, and were damaged thereby.

159. During the Class Period, Calavo securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants and E&Y made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Calavo securities at prices artificially inflated by Defendants' and E&Y's wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, nor would they have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Calavo securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Calavo securities declined

sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

160. By reason of the conduct alleged herein, Defendants and E&Y knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161. As a direct and proximate result of Defendants' and E&Y's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

## Violation of Section 20(a) of The Exchange Act Against The Individual Defendants and the Audit Committee Defendants

**Individual Defendants**

162. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

163. During the Class Period, the Individual Defendants participated in the operation and management of Calavo, and conducted and participated, directly and indirectly, in the conduct of Calavo's business affairs. Because of their senior positions, they knew the adverse non-public information about Calavo's misstatement of income and expenses and false financial statements.

164. As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Calavo's financial condition and results of operations, and to promptly correct any public statements issued by Calavo which had become materially false or misleading.

165. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Calavo disseminated in the marketplace during the Class Period concerning Calavo's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Calavo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Calavo within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Calavo securities.

166. Defendants Cole and Bruno were authorized to, and did, participate in the release of the financial statements and signed off on the statements as correct, despite the statements containing materially false and misleading statements, thus qualifying them as control person(s) under §20(a).

167. Each of the Individual Defendants, therefore, acted as a controlling person of Calavo. By reason of their senior management positions and/or being directors of Calavo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Calavo to engage in the unlawful acts

and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Calavo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

168. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Calavo.

**Audit Committee Defendants**

169. As members of the audit committee, the Audit Committee Defendants had an affirmative duty of oversight and responsibility for the integrity of Calavo's financial reporting.

170. As chair of the audit committee, Defendant Carbone was involved with the creation or approval of the financial statements included in Calavo’s SEC 10–Q and 10–K filings. The Audit Committee delegated authority to the chair of the Audit Committee to pre-approve or ratify transactions where the aggregate amount involved is expected to be less than $200,000.

171. During their tenure as directors of Calavo, each of these Defendants was a controlling person of Calavo within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as directors, and Audit Committee members, of Calavo, these Defendants had the power and authority to cause Calavo and the Officer Defendants to engage in the wrongful conduct complained of herein. These Defendants were able to, and did, control, directly and indirectly, the content of the public statements made by Calavo

during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

172. Calavo maintains an Audit Committee, composed of certain Board members, that reports to Calavo's full Board of Directors. As detailed above, at some time during the Class Period, Defendants Carbone, Barnes, DiGregorio, Hollister and Hunt (the "Audit Committee Defendants") each participated as a member of the Audit Committee.

173. As set forth herein, each of these Defendants had the power to control and/or influence the particular practices and conduct giving rise to the securities violations alleged herein, and exercised the same. In their capacities as directors and members of the Audit Committee of Calavo, and during their tenure, these Defendants each reviewed the false and misleading financial statements filed with the SEC and disseminated to the public. As a result, these Defendants were controlling persons within the meaning of Section 20(a) of the Exchange Act.

174. According to the Audit Committee Charter, the Audit Committee performed the following functions: (1) assisted with the oversight of the integrity of the Company's financial reporting process and financial statements and systems of internal controls; (2) prepared the annual report of the Audit Committee; (3) evaluated the qualifications, performance, and independence of the independent auditor; (4) evaluated qualifications and performance of the internal audit team members; (5) met with the independent auditor prior to the annual audit to discuss the scope, timing, cost and staffing of the audit, and discuss the results of the annual audit with the independent auditor; (6) reviewed and discussed with

management and the independent auditor the Company's annual financial statements, the disclosures relating to management's discussion and analysis of financial condition and results of operations in the Annual Report on Form 10-K; (7) reviewed and discussed with management and the independent auditor the Company's quarterly financial statements, and disclosures relating to management's discussion and analysis of financial condition and results of operations, prior to the filing of each Quarterly Report on Form 10-Q; (8) reviewed with the independent auditor the auditor's judgments about the quality and appropriateness of the Company's accounting principles; (9) reviewed with management and the independent auditor the adequacy and effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting; (10) reviewed with management and internal audit; (11) reviewed with management, internal audit, and the independent auditor the adequacy of the Company's internal controls; (12) obtained reports from management, confirming that the Company is in compliance with applicable requirements relating to financial and accounting matters; (13) reviewed and established procedures for (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and (b) the confidential, anonymous submission by employees and external parties of concerns; and (14) reviewed and approved the enterprise-wide risk assessment and the internal controls work plan prepared by internal audit for the upcoming year.

175. As a result of their positions as Audit Committee members, over and above their positions as Board members, each of the Audit Committee Defendants

is liable as a control person of Calavo within the meaning of Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against all Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring all Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: June 22, 2015

Respectfully submitted,

/s/ Patrick V. Dahlstrom

**POMERANTZ LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
Mark Bryan Goldstein
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
lsmollar@pomlaw.com
mbgoldstein@pomlaw.com

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
migross@pomlaw.com
jalieberman@pomlaw.com

***Lead Counsel for Lead Plaintiffs and the Class***

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com

***Liaison Counsel for Lead Plaintiffs and the Class***