POMERANTZ LLP
JENNIFER PAFITI (#282790)
468 North Camden Dr.
Los Angeles, California 90210
Telephone: (310) 285-5330
E-mail: jpafiti@pomlaw.com

*Attorneys for Lead Plaintiff*
[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERIF E. EL DABE, JOHN O'HANLON, AND ELLIOT C. NELMS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CALAVO GROWERS, INC., LECIL E. COLE, ARTHUR BRUNO, JAMES E. SNYDER, EGIDIO CARBONE, GEORGE BARNES, MIKE A. DIGREGORIO, STEVEN W. HOLLISTER, and JOHN M. HUNT<br>Defendants. | **No. 2:15-cv-00400-GW-AS**<br><br>**<u>CLASS ACTION</u>**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiffs Sherif E. El Dabe, John O'Hanlon and Elliot C. Nelms ("Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Amended Complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Calavo Growers, Inc., ("Calavo" or the "Company"), analysts' reports and advisories about the Company, Interviews with former Calavo employees, Interviews with former Renaissance Food Group Employees, Consultations with accounting experts, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased or otherwise acquired Calavo common stock between September 9, 2014 and January 14, 2015, both dates inclusive (the "Class Period"). Plaintiffs seek to pursue remedies against Calavo and certain of its officers and directors for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Calavo markets and distributes avocados and other perishable foods worldwide to food distributors, produce wholesalers, supermarkets, convenience

stores and restaurants. Calavo was founded in 1924 as a growers' co-op, but incorporated and went public in July 2002. The Company is headquartered in Santa Paula, California and trades on the Nasdaq Global Exchange ("NASDAQ") under the ticker symbol "CVGW."

3. In June 2011, Calavo acquired an entirely new line of business, Renaissance Food Group, LLC ("RFG"), a closely-held fresh-food company that produces, markets and distributes nationally a portfolio of healthy, high quality lifestyle products for consumers.

4. The acquisition by Calavo was part of a strategy to diversify its revenue stream, which would also offset the potential impact of a massive drought that had been impacting the state of California and the production of avocados. The transaction ("RFG Acquisition"), which closed in June 2011, settled for a combination of cash and stock, including potential earn-out payments based on financial performance.

5. However, the acquisition came with a steep price. Pursuant to the RFG Acquisition Agreement, Calavo agreed to pay on the closing date approximately $16 million. In addition, provided that RFG attained specified financial goals related to RFG's EBIDTA and revenue for certain 12-month periods prior to the fifth anniversary of the closing, the RFG Acquisition Agreement ***required*** Calavo to pay RFG up to approximately $84 million in additional earn-out payments, payable in cash and shares of unregistered Calavo common stock ("Earn-Out payments"). Accordingly, if the maximum Earn-Out payments were to be earned, the total consideration payable to RFG pursuant to the RFG Acquisition Agreement would be approximately $100 million from the time of closing to the end of the five-year Earn-Out payment period.

6. RFG substantially exceeded the financial goals. Thus, significant profit increases for the Company over the three years following the Acquisition were offset by the maximum amount of obligations related to the Earn-Out payments.

7. Where, as here, any portion of an earn-out payment requires net cash settlement, accounting rules, as set forth in United States Generally Accepted Accounting Principles ("GAAP"), require that these earn-out payments be classified as a liability on the balance sheet of the acquirer at fair value, and evaluated as of the end of each quarterly and annual period to see if changes in the fair value of such have occurred. Any declines in the fair value of the contingent consideration needed to be recorded as a loss (i.e., expense) in Calavo's income statements. Any such recognition would, naturally, reduce Calavo's profits in those same periods. *See e.g., FASB[1] Accounting Standards Codification rule section ("ASC")No.450 Contingencies ("ASC 450") ASC No. 480,* ("ASC 480"), *Distinguishing Liabilities from Equity("ASC 480"),* and *ASC No. 815, Derivatives and Hedging ("ASC 815")*. In blatant disregard of this obvious GAAP rule, Calavo buried the contingent consideration as "shareholder equity," which is an item on the balance sheet, below the line of net assets and liabilities. The classification as such eliminated the requirement for Calavo to reflect the impact of changes in the fair value of the contingent consideration in net income and related profits.

8. The requirements for classifying contingent consideration as equity are extremely stringent and, thus, such treatment is very rare in the accounting

---

[1] Referring to the Financial Accounting Standards Board, the entity accepted by both the SEC, the Public Company Accounting Oversight Board (the "PCAOB") and the American Institute of Certified Public Accountants ("AICPA") as having the power and responsibility to promulgate GAAP.

world. Indeed, in the case of Calavo, there was nothing complicated about the Earn-Out payments pursuant to the RFG Acquisition that required complex judgment. The specific provisions thereof clearly precluded equity treatment. Accounting guidance, and specifically ASC 815 and ASC 480 speak directly to the RFG Acquisition Agreement that occurred here, clearly indicating that the contingent consideration associated with the Earn-Out payments should have been booked as a liability.

9. While Defendants disclosed that the triggers were met to pay the maximum Earn-Out payments, Defendants failed to properly record the contingent consideration under both GAAP provisions, resulting in significant material misstatements in Calavo's publicly filed financial statements. As the criteria for equity classification are so rigorous and inflexible, the Company's chosen accounting for it should have raised a red flag within the financial reporting group, especially for the CFO, Defendant Bruno.

10. Defendants' GAAP violation, misclassifying the contingent consideration, was so obvious that, immediately upon the arrival of a new external audit partner on the Calavo engagement, the accounting impropriety was disclosed.

11. Defendant's actions caused representations about Calavo's performance to be materially distorted. Whereas the Company had reported profits of $74.9 million for 2012, 2013 and the first nine months of fiscal 2014, in fact, properly accounting for the RFG Earn-Out payment would have wiped out the majority of Calavo's reported profits for most of those periods, the largest of which occurred during the Class Period. Net income and earnings per share were overstated, therefore, by approximately **2,000%** for the nine months ending 2014. In 2014 alone, the restatement erased approximately $40 million of

reported earnings. Without the accounting manipulations, Calavo would have fallen far short of analysts' expectations. For example, for the Third Quarter of 2014("3Q2014"), analyst consensus of earnings was $0.46 per share ("EPS"), wherein Calavo had reported $0.53. However, Calavo's actual earnings, as reflected in the restatement, were only $0.09 per share, falling far short of analyst expectations.

12. These errors demonstrate, as eventually acknowledged by Calavo in the restatement, that, throughout the Class Period, Calavo lacked adequate internal controls over financial reporting, and upper management exhibited a total disregard for the accuracy of its published financial statements.

13. Specifically, during the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Calavo failed to maintain a liability on its financial statements for contingent consideration pursuant to its acquisition of RFG; (ii) Calavo had recorded its contingent Earn-Out payments in equity rather than as a liability, (iii) Calavo understated operating expenses, causing a significant overstatement of its operating income, net income, and EPS (and other measures of earnings reflected in or calculated from the amounts) as reported in its financial statements during the Class Period; (iv) the Company lacked adequate internal controls over financial reporting; and (v) as a result of the above, the Company's financial statements were materially false and misleading during the Class Period.

14. The fraudulent scheme was not revealed until January 15, 2015, when Calavo disclosed that it would restate its Class Period financial statements. The Company disclosed that, in connection with the preparation, review, and audit of the Company's consolidated financial statements required to be included in its Annual Report on Form 10-K for the fiscal year ended October 31, 2014, it

had identified misstatements in its consolidated financial statements related to its treatment of contingent consideration from the acquisition of RFG in June 2011. These misstatements resulted in Calavo recording, in connection with the restatement, additional amortization expense in its income statement totaling $88.9 million before tax ($54.0 million net of tax).

15. The Company also announced that the Audit Committee of the Board of Directors (the "Audit Committee") of Calavo had concluded that the Company's consolidated financial statements for the fiscal years ended October 31, 2013 and 2012 and the quarters therein, as well as the quarters ended January 31, 2014, April 30, 2014 and July 31, 2014, should no longer be relied upon. Similarly, the Company announced that the related press releases and stockholder communications describing the Company's consolidated financial statements for the those same periods should no longer be relied upon.

16. Pursuant to ASC No. 250, *Accounting Changes and Error Corrections* ("ASC 250"), the restatement announced by Calavo constituted a correction of material errors due to an oversight or misuse of facts which existed at the time the original financial statements were issued.

17. Moreover, since changes to accounting estimates do not give rise to the restatement of previously-issued financial statements, the restatement of Calavo's financial statements issued during the Class Period is NOT merely an acknowledgment that the Company decided to use a new methodology for estimating accounting for the contingent consideration arising from the RFG Acquisition. Instead, pursuant to ASC 250:

> A change in accounting estimate shall be accounted for in the period of change if the change affects that period only or in the period of change and future periods if the change affects both. <u>A change in accounting estimate shall not be accounted for by restating or</u>

> retrospectively adjusting amounts reported in financial statements of prior periods or by reporting pro forma amounts for prior periods.

*ASC 250-10-45-17*. (emphasis supplied)

18. Calavo's restatement of its Class Period financial statements, as disclosed on January 15, 2015 and reflected in the filing of its 2014 10-K filed with the SEC on January 30, 2015, is an *admission* that the financial statements, including the Company's statements in its management discussion and analysis ("MD&A") section included in the Company press releases and quarterly reports filed with the SEC on Form 10-Q were materially false and misleading as originally-filed, and an admission by Calavo that the financial statements it issued during the Class Period were false based on information known to Defendants at the time.

19. The enormity of the fraud is evidenced by the restatement requiring eleven consecutive quarters of financials to be restated, with the largest portion of the restatement occurring during the Class Period. For the three months ended January 31, 2014, operating income was misstated by 240.0%, net income was misstated by 325.1% and earnings per share was overstated by 327.3%.

20. For the three months ended April 2014, operating income was overstated by 263.9%, net income was overstated by 331.8% and earnings per share was overstated by 330%.

| | Three Months Ended April 30, 2014 | | | Three Months Ended April 30, 2013 | | |
|---|---|---|---|---|---|---|
| | As reported | Adjustments | Restated | As reported | Adjustments | Restated |
| Net sales | 194,894 | — | 194,894 | 166,336 | — | 166,336 |
| Cost of sales | 175,917 | 85 | 176,002 | 154,800 | 61 | 154,861 |
| Gross margin | 18,977 | (85) | 18,892 | 11,536 | (61) | 11,475 |
| Selling, general and administrative | 9,111 | 34 | 9,145 | 7,991 | 24 | 8,015 |
| Contingent consideration related to RFG acquisition | — | 7,036 | 7,036 | 199 | 1,926 | 2,125 |
| Operating income (loss) | 9,866 | (7,155) | 2,711 | 3,346 | (2,011) | 1,335 |
| Interest expense | (292) | — | (292) | (317) | — | (317) |
| Other income, net | 270 | — | 270 | 235 | — | 235 |
| Income (loss) before provision for income taxes | 9,844 | (7,155) | 2,689 | 3,264 | (2,011) | 1,253 |
| Provision (benefit) for income taxes | 3,432 | (1,999) | 1,433 | 1,071 | (292) | 779 |
| Net income (loss) | 6,412 | (5,156) | 1,256 | 2,193 | (1,719) | 474 |
| Add: Net loss attributable to noncontrolling interest | 298 | — | 298 | 20 | 15 | 35 |
| Net income (loss) attributable to Calavo Growers, Inc. | 6,710 | (5,156) | 1,554 | 2,213 | (1,704) | 509 |
| Calavo Growers, Inc.'s net income (loss) per share: | | | | | | |
| Basic | 0.43 | (0.33) | 0.10 | 0.15 | (0.12) | 0.03 |
| Diluted | 0.43 | (0.34) | 0.09 | 0.15 | (0.12) | 0.03 |
| Number of shares used in per share computation: | | | | | | |
| Basic | 15,755 | — | 15,755 | 14,819 | — | 14,819 |
| Diluted | 15,764 | 1,412 | 17,176 | 14,839 | 756 | 15,595 |
| [illegible] | [illegible] | — | [illegible] | [illegible] | — | [illegible] |
| Diluted | 15,764 | 1,412 | 17,176 | 14,839 | 756 | 15,595 |

21. For the three months ended July 31, 2014 operating income was overstated by 189.9%, net income was overstated by 933.7% and earnings per share were overstated by 920%.

| | Three Months Ended July 31, 2014 | | | Three Months Ended July 31, 2013 | | |
|---|---|---|---|---|---|---|
| | As reported | Adjustments | Restated | As reported | Adjustments | Restated |
| Net sales | 218,702 | — | 218,702 | 194,943 | — | 194,943 |
| Cost of sales | 197,757 | 769 | 198,526 | 176,865 | 181 | 177,046 |
| Gross margin | 20,945 | (769) | 20,176 | 18,078 | (181) | 17,897 |
| Selling, general and administrative | 9,431 | 307 | 9,738 | 8,349 | 72 | 8,421 |
| Contingent consideration related to RFG acquisition | — | 23,249 | 23,249 | 357 | 2,974 | 3,331 |
| Operating income (loss) | 11,514 | (24,325) | (12,811) | 9,372 | (3,227) | 6,145 |
| Interest expense | (220) | — | (220) | (293) | — | (293) |
| Gain on deconsolidation of FreshRealm | 12,622 | — | 12,622 | — | — | — |
| Other income, net | 120 | — | 120 | 209 | — | 209 |
| Income (loss) before provision for income taxes | 24,036 | (24,325) | (289) | 9,288 | (3,227) | 6,061 |
| Provision (benefit) for income taxes | 8,064 | (9,844) | (1,780) | 3,163 | 636 | 3,799 |
| Net income (loss) | 15,972 | (14,481) | 1,491 | 6,125 | (3,863) | 2,262 |
| Add: Net loss attributable to noncontrolling interest | 60 | — | 60 | 274 | 136 | 410 |
| Net income (loss) attributable to Calavo Growers, Inc. | 16,032 | (14,481) | 1,551 | 6,399 | (3,727) | 2,672 |
| Calavo Growers, Inc.'s net income (loss) per share: | | | | | | |
| Basic | 1.02 | (0.92) | 0.10 | 0.43 | (0.25) | 0.18 |
| Diluted | 1.02 | (0.93) | 0.09 | 0.43 | (0.26) | 0.17 |
| Number of shares used in per share computation: | | | | | | |
| Basic | 15,760 | — | 15,760 | 14,848 | — | 14,848 |
| Diluted | 15,769 | 1,898 | 17,667 | 14,870 | 946 | 15,816 |

22. On the January 15, 2015 disclosure, upon the market learning for the first time that Calavo would restate its financials due to GAAP violations related to its mistreatment for contingent consideration, and that deficiencies in internal controls existed during the Class Period, shares of Calavo fell $4.72 per share, or over 9%, to close at $43.07 per share on January 15, 2015 and another 9% on the next day, dropping to $40.17 as the news was absorbed into the market, indicative of the amount by which investors had overpaid for their shares, and the damages they sustained.

23. The Defendants benefitted from the material misstatements by being able to report profits during a period of uncertainty regarding production of California avocados, its core business, resulting from the drought in California, which began in 2011, and lasted throughout the Class Period. Indeed, in January 2014, the California Governor declared a drought emergency.[2] The three year period during which the Company was cooking its books coincided with the drought and its negative impact on the production of avocados in California. The Company's production of California avocados in 2014 was 50% of what it had produced in 2013.

24. During the Class Period, without the accounting machinations and misrepresentations discussed herein, Calavo would have had large operating and net income losses rather than showing profits. The inflated financials allowed the Company to beat analyst estimates rather than falling short, which caused the price of Calavo common stock to be inflated. EPS in 3Q2014 was overstated by 920%. The Company had reported beating analyst consensus of $0.46 with earnings of $.53 per share. However, Calavo fell far short of those expectations, in reality only earning $0.09 per share. Further, 3Q2014 net income was actually only $1.5 million instead of Calavo's reported $16 million.

25. The Individual Defendants directly benefitted from their misconduct, standing to reap huge bonuses and compensation packages for reporting inflated financial results. Throughout the Class Period Defendants Cole and Bruno were eligible to receive performance-based compensation based upon the achievement of specified performance goals. During the 2014 fiscal year, the performance-based goal was based upon net income, and Defendants Cole and

---

[2] http://www.usatoday.com/story/weather/2014/01/17/california-drought-emergency/4581761/

Bruno would receive a percentage of Calavo's net income only if the Company achieved a threshold net income of $16,000,000. It is not a coincidence that the fraud committed here inflated net (and operating) income—the very metric used to determine the Individual Defendants' bonuses. For 2014, the percentage of net income that Cole and Bruno were entitled to receive as a performance-based bonus was as follows:

| Executive Officer | Net income: $16M-$17M, bonus percent of net income: | Net income: $17M-$18M, bonus percent of net income: | Net income: $18M-$19M, bonus percent of net income: | Net income: $19M-$20M, bonus percent of net income: | Net income: $20M-$21M, bonus percent of net income: | Net income: $21M-$22M, bonus percent of net income: | Net income: $22M-$23M, bonus percent of net income: | Net income: $23M & above bonus percent of net income: |
|---|---|---|---|---|---|---|---|---|
| Lecil Cole | 3.50% | 4.00% | 4.50% | 5.00% | 5.50% | 6.00% | 6.50% | 7.00% |
| Arthur Bruno | 1.25% | 1.60% | 1.95% | 2.30% | 2.65% | 3.00% | 3.35% | 3.70% |

26. Indeed, Defendants' manipulation of its financial statements allowed them to report net income of $16 million in the Third Quarter of 2014—the minimal number Defendants Bruno and Cole needed to achieve in order to receive **any** bonus, when in reality, net income was actually only $1.5 million for that quarter. Without any financial manipulations, net income for 2014 was only *$97,000*, far short of the $16 million needed for bonuses.

27. Calavo's January 15, 2015 disclosure of its GAAP violations related to its treatment of the contingent consideration and corresponding restatement, which acknowledged deficiencies in Calavo's system of internal controls, was a substantial cause of the decline of Calavo's stock price. Upon disclosure of Defendants' wrongful acts and omissions, the price of Calavo common stock declined precipitously, which caused Plaintiffs and other Class members to suffer significant losses and damages.

## JURISDICTION AND VENUE

28. The claims asserted herein arise under, and pursuant to, §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

29. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

30. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

31. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

### Plaintiffs

32. Lead Plaintiff Sherif E. El Dabe purchased shares of Calavo common stock based on the Company's materially untrue and misleading financial statements at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

33. Lead Plaintiff John O'Hanlon purchased shares of Calavo common stock based on the Company's materially untrue and misleading financial statements at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

34. Lead Plaintiff Elliot C. Nelms purchased shares of Calavo common stock based on the Company's materially untrue and misleading financial

statements at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

**Defendants**

35. Defendant Calavo markets and distributes avocados, prepared avocados, and other perishable foods to food distributors, produce wholesalers, supermarkets, convenience stores, and restaurants worldwide. Calavo was founded in 1924, is headquartered in Santa Paula, California, and trades on the NASDAQ under the ticker symbol "CVGW."

36. Defendant Lecil E. Cole ("Cole") served as the Company's Chairman of the Board, President, and Chief Executive Officer("CEO") during the Relevant Period.

37. Defendant Arthur Bruno ("Bruno") served as the Company's Chief Operations Officer, Chief Financial Officer("CFO") and Corporate Secretary during the Relevant Period.

38. Defendants referenced above in ¶¶36-37 are sometimes referred to herein, collectively, as the "Individual Defendants."

39. Defendant Egidio (Gene) Carbone ("Carbone") was at all relevant times, Chairman of the Audit Committee. Carbone served as Vice-President, Finance, and Corporate Secretary for Calavo from 1980 to 2002. He was also an active Certified Public Accountant ("CPA") from 1967 to 2002 in the State of California and has taught accounting and finance at the college level. He has served as a member of the board of directors of the California Avocado Commission from 2008 to present.

40. Defendant George H. Barnes ("Barnes") was at all relevant times a member of the Audit Committee. Barnes has owned and operated avocado

groves since 1988 and has served as a member of the California Avocado Commission for eight years.

41. Defendant Michael A. DiGregorio ("DiGregorio") was at all relevant times a member of the Audit Committee. DiGregorio spent the past 30 years in senior financial and operating capacities in domestic and international markets. A CPA by background, he has been CFO of public and private companies, and also a president of two large organizations.

42. Defendant Steven Hollister ("Hollister") was at all relevant times a member of the Audit Committee. Hollister is a Managing Member of Rocking Spade, LLC, as a diversified investor and developer, with interests in ranching, vineyards and commercial properties. Mr. Hollister served as Vice President of Sunrise Mortgage & Investment Company, a commercial mortgage broker, from 2006 to 2013. Additionally, Mr. Hollister served as Chief Operating Officer of Fess Parker Winery & Vineyard and Santa Barbara County Wine Center from 2002 to 2006. In addition, Mr. Hollister was Senior Vice President of Central Coast Farm Credit for 17 years.

43. Defendant John M. Hunt ("Hunt") was at all relevant times a member of the Audit Committee. Hunt has served as the General Manager of Embarcadero Ranch since 1982, where he manages a 400-acre avocado and citrus ranch.

44. The Board determined that Defendants Carbone and DiGregorio were audit committee financial experts as defined by SEC rules and applicable listing standards.

45. Defendants Carbone, Barnes, DiGregorio, Hollister and Hunt are referred to herein as the "Audit Committee Defendants."

46. The Audit Committee Defendants served on Calavo's Audit Committee of the Board of Directors throughout the Class Period, and were responsible for, *inter alia*: (i) reviewing and discussing the audited annual financial statements of the Company with management, as well as the quarterly reports filed with the SEC on Form 10-Q; and (ii) reviewing with management and the independent auditor the adequacy and effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting

47. Calavo, the Individual Defendants, and the Audit Committee Defendants are referred to herein, collectively, as the "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

48. Calavo procures and markets avocados and other perishable commodities. The Company operates its business through three segments: Fresh Products, Calavo Foods, and Renaissance Food Group. The Fresh Products segment includes all operations that involve the distribution of avocados and other fresh produce products. The Calavo Foods segment represents all operations related to the purchase, manufacturing, and distribution of prepared products, such as guacamole. The Renaissance Food Group segment represents all operations related to the manufacturing and distribution of fresh-cut fruit, ready-to-eat vegetables, recipe-ready vegetables and deli meat products.

49. Avocados are an increasingly in-demand product in the United States. Calavo is one of the largest suppliers of avocados in the United States, which sources avocados from California, Mexico, and Chile. As of February 2014, avocados made up about 60% of the Company's sales. In addition to selling whole avocados, Calavo also processes them into other products from

pulp to guacamole, so its reliance on avocados is heavier than the 60% figure above suggests.

50. In fiscal 2013, Calavo estimated that it handled 30% of all of the avocados grown in the state of California. Like all farm-related business, however, Calavo is subject to the vagaries of weather and climate, which, during the Class Period meant that it suffered from the on-going drought in California. In 2014, coinciding with the Class Period, California experienced its worst dry spell on record. Whitney Irick, *California Drought: Frequently Asked Questions*, NBC Los Angeles, available at http://www.nbclosangeles.com/news/local/Drought-California-Drought Weather-Water-Conservation-250398291.html.

51. This extreme drought affected avocado farmers because "[i]t takes 74 gallons of water to produce one pound of avocados—and drought-stricken California produces 95 percent of the avocados grown in the United States." Padma Nagappan, *Kiss Your Guacamole Good-Bye: Drought-Stricken California Farmers Stop Growing Avocados*, Take Part, available at http://www.takepart.com/article/2014/11/03/kiss-your-guacamole-goodbye-california-farmers-stop-growing-avocados.

52. In 2014 there was much concern regarding the drought's effect on agribusiness. On July 15, 2014 just before the start of the Class Period, the Wall Street Journal stated, "California's drought will cost the state $2.2 billion this year in losses and added expenses for its giant agriculture industry, while cutting 17,100, or 3.8%, of the state's farm jobs." Jim Carlton, *California Drought Will Cost $2.2 Billion in Agriculture Losses This Year*, The Wall Street Journal, available at http://www.wsj.com/articles/drought-will-cost-california-2-2-billion-in-losses-costs-this-year-1405452120.

53. The Drought resulted in a steady decrease in the amount of California avocados sold by Calavo. In 2014, Calavo sold almost *half* as many California avocados as it did the prior year.

| | 2014 | 2013 |
|---|---|---|
| lbs. of CA avocados sold | 74,438 | 141,400 |
| lbs. non-CA avocados sold | 258,940 | 218,244 |
| lbs. processed avocados sold | 26,451 | 21,636 |

**RFG ACQUISITION**

54. RFG was a leader in the fast-growing refrigerated fresh packaged goods category, which added a broad product line-up under the Garden Highway and Chef Essentials brands to Calavo's existing product line.

55. On May 25, 2011 Calavo acquired 100 percent ownership in RFG. Pursuant to the RFG Acquisition Agreement, Calavo paid approximately $16 million to RFG in a combination of cash and shares of unregistered Calavo common stock at closing. The transaction, which closed in June 2011, also included additional Earn-Out payments from Calavo to RFG, for a maximum of $84 million, based on future financial performance of RFG.

56. Pursuant to the RFG Acquisition Agreement, if RFG's operating results exceeded defined thresholds, additional consideration was required to be paid by the Company, subject to a ceiling, in the form of both cash and Calavo stock. Calavo agreed to pay RFG additional consideration in two stages, as defined in the RFG Acquisition Agreement (of up to an additional $84 million) if

RFG attained specified financial goals for certain 12-month periods prior to the fifth anniversary of the closing date. The additional payments were to be paid in a combination of cash and unregistered common stock shares, with a fixed price of $23.00 per share.

57. There is no dispute that RFG met the thresholds set forth in the RFG Acquisition Agreement which obligated Calavo to pay the additional maximum Earn-Out payments. However, Calavo did not properly record the contingent consideration, causing a vast overstatement of its income and profits throughout the Class Period.

58. The RFG Acquisition Agreement provided that Calavo would pay RFG $5 million in cash and 827,000 shares at $23.00 per share if the maximum Stage 2 earn-out was achieved, and $50 million in cash plus 434,783 shares paid at $23 per share if the maximum Stage 3 Earn-Out was achieved. Both potential earn-outs were based on RFG's EBITDA and Revenue. Therefore, Stage 2 and 3 potential earn-outs were equal to **$**29 million equity and $55 million in cash, and both were fixed amounts based on the targets reached.

59. On July 31, 2013, Calavo and the sellers of RFG entered into Amendment No. 1 to the RFG Acquisition Agreement. The amendment altered the terms of the original agreement to as follows:

> (1) Calavo shall deliver $5,000,000 of Common Stock to the Sellers, as part of the Stage 2 Maximum Earn-Out Consideration instead of delivering $5,000,000 of cash to the Sellers;
>
> **(2) the Sellers shall receive specified price protection[3] from Calavo with respect to the sale of such Common Stock; and**

---

[3] "Price Protection, as defined, is broken into two parts: (1) additional shares of [Calavo] common stock[] and (2) a potential cash payment." Calavo Form 10-K for the Fiscal year ended October 31, 2013, filed with the SEC on January 13, 2014.

> (3) Calavo shall file with the Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-3 (the "Registration Statement") which shall cover the public resale of such Common Stock by the Sellers during the period specified in the Amendment.
>
> (Emphasis added.)

60. On October 1, 2013, Calavo and the sellers of RFG entered into Amendment No. 2 to the RFG Acquisition Agreement. The amendment changed the former terms of the original agreement to as follows:

> (1) with respect to the portion of the Stage 3 Maximum Earn-Out Consideration or the Stage 3 Scale Earn-Out Consideration, as applicable, that is currently required by the Merger Agreement to be paid in cash amounts to the Sellers, Calavo shall have the right to elect to pay all or a portion of such cash amount by delivery of additional Merger Shares to the RFG Nominee Trust (the "Trust"), for the benefit of the Sellers;
>
> **(2) the Sellers shall receive specified price protection[4] from Calavo with respect to the Trust's sale of shares of Common Stock on the Nasdaq Stock Market, up to the total number of shares of Common Stock issued to the Trust pursuant to this Second Amendment; and**
>
> (3) Calavo shall file with the SEC a Registration Statement on Form S-3 covering the Trust's resale on the Nasdaq Stock Market of any additional Merger Shares issued pursuant to the Second Amendment for sales that occur during the period specified in this Second Amendment. Any additional Merger Shares issued by Calavo in lieu of cash payments to the Sellers will be valued for this purpose at the closing price of Calavo Common Stock as reported on the Nasdaq Stock Market at the time of issuance.
>
> (Emphasis added.)

[4] See footnote 3 for definition of Price Protection.

61. The amendments provided that the $5 million and $50 million (Stage 2 and 3) may be delivered in stock but with a price protection, meaning that if the sellers were unable to sell the shares on the NASDAQ for what equaled to ($5 million and $50 million) then the buyers would have to make it up in either cash or shares.

62. Stage 2 of the Earn-Out was paid in October 2013. Pursuant to the Amendments, Calavo issued 172,117 shares (at a share price of $29.05), which was equivalent to the $5 million in cash called for in the original agreement, and 827,000 shares at $23.00 per share($19 million) for a total of $24,021,000. From October 2013 to November 2013, the Sellers (i.e., RFG) sold all 172,117 shares for $5.0 million.

63. Stage 3 of the earn-out was paid October 23, 2014, which consisted of 434,783 shares at $23.00 per share, as well as an additional 1,097,213 shares at the then stock price of $45.57 (which was the equivalent of the $50 million called for in the original agreement).

64. Calavo's restatement states that it paid the Earn-Out in both cash and stock.

**GAAP VIOLATIONS**

65. Initially, Calavo recorded the contingent consideration within the equity section of its balance sheet and, therefore, did not reflect any changes in the fair value thereof (i.e., expenses) in its income statement during the Class Period. The Company has now admitted, however, that the contingent consideration should have been accounted for as a liability, requiring re-measurement to fair value and expense recognition (if the value of such had been found to decline, which Calavo was to treat as an amortization expense), at each reporting period subsequent to the acquisition. Such failure caused Calavo to

avoid recording significant and material expenses during the Class Period, which overstated its net income, EBITDA, and EPS.

**The Company's Improper Accounting for Contingent Consideration**

66. While Defendants properly acknowledged that the future Earn-Out payment constituted contingent consideration, they failed to properly (a) characterize the nature of the contingent consideration on the balance sheets of Calavo (i.e., as a liability) and (b) record the periodic income statement impact associated with changes in the fair value of the contingent consideration. Once an arrangement entered into in connection with an acquisition is determined to include contingent consideration, an entity must determine if such should be classified as equity or as a liability. *ASC No. 805*, *Business Combinations* ("ASC 805"), *805-30-25-6*. In either case, the acquirer shall recognize the fair value of contingent consideration at the acquisition date as part of the consideration transferred in exchange for the acquiree. *ASC 805-30-25-5*. However, contingent consideration classified as equity does not need to be re-measured to fair value at each reporting date, whereas contingent consideration classified as a liability must be re-measured at each reporting date until the contingency is resolved. For liability classification, any changes in fair value will be recognized in earnings until the contingent arrangement is settled which would result in potential impacts upon the income statement of the acquiror. *ASC 805-30-35-1*.

67. Brian Duffy, CPA, CFF, a principal at the accounting firm of Shechtman Marks Devor PC, Certified in Financial Forensics and a Certified Fraud Examiner, reviewed the RFG Acquisition Agreement and Amendments thereto, as well as Calavo's Form 10-K's for the years ending 2011-2014(which includes the restatement), Calavo's Form 10-Q for the period ending July 31,

2014, and the relevant GAAP provisions distinguishing between equity and liability treatment. According to Mr. Duffy:

> "[u]nder both the RFG Acquisition Agreement and the Amendments thereto, the GAAP provisions applicable unquestionably provide that the contingent consideration should have been booked as a liability. The accounting evaluation is simple and obvious, and not subject to judgment. Indeed, there was nothing exotic about the Earn-Out provisions in the instant matter, and such provisions in the RFG Acquisition Agreement clearly called for treatment and recognition of the contingent consideration as a liability."

68. The contingent payment at issue here, to be settled in a combination of cash and Calavo common stock, needed to be evaluated under both ASC 480 and ASC 815.

69. Earn-out provisions are common in the current environment of mergers and acquisitions, and they are usually booked as a liability. From smaller accountants to the "Big 4" accounting firms, to large financial advisors, the topic of accounting for contingent consideration based on future Earn-Out targets is a widely published subject. For example, PriceWaterhouseCoopers published an article in February 2010 entitled "Mergers & Acquisitions-A Snapshot" providing that, in most cases, the type of earn-out that occurred between Calavo and RFG will be liability-classified "([a]s a result [of an earn-out failing to meet any one of the conditions required for equity classification] liability treatment for most earnouts will be likely under the M&A Standards, including those that are required to be settled in a buyer's own shares"). *Id.*at p.4.[5]

**<u>Requirements for Equity Classification</u>**

[5] *See also* Duff & Phelps "2012 Contingent Consideration Study: Earn-out Structuring and Valuation" dated August 2012 (Classification of contingent consideration as equity, however, is not common"; Grant Thornton "On the Horizon" dated June 12, 2012(providing a simple analysis in accounting for contingent consideration under both ASC 480 and ASC 815-40).

70. In most scenarios, contingent consideration is recorded as a liability on the balance sheet because, in order for a contingent consideration to qualify for equity classification, there are stringent criteria and multiple levels of requirements that must be met. In order to get to equity classification, the contingent consideration must not meet the definition of a liability under ASC 480. If the arrangement does not meet the definition of a liability under ASC 480, a company would then need to consult and satisfy a completely separate set of criteria set forth within ASC 815 in order to determine if the contingent consideration is considered to be equity.

71. ASC 480 states:

> Section 480-10-25 requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances) because that financial instrument embodies an obligation of the issuer.
>
> Standard **05-2** All of the following are examples of an obligation:
>
> a. An entity incurs a conditional obligation to transfer assets by issuing (writing) a put option that would, if exercised, require the entity to repurchase its equity shares by physical settlement. (Further, an instrument that requires the issuer to settle its obligation by issuing another instrument [for example, a note payable in cash] ultimately requires settlement by a transfer of assets.)
>
> b. An entity incurs a conditional obligation to transfer assets by issuing a similar contract that requires or could require net cash settlement.
>
> c. An entity incurs a conditional obligation to issue its equity shares by issuing a similar contract that requires net share settlement.

72. ASC 480 also provides that even where the issuer may settle the Earn-Out by issuing a variable number of its equity shares, the contingent consideration shall be classified as a liability if, at inception, the monetary value of the obligation is based solely or predominantly on <u>any</u> of three specified criteria:

> A financial instrument that embodies an unconditional obligation, or a financial instrument other than an outstanding share that embodies a conditional obligation, that the issuer must or may settle by issuing a variable number of its equity shares shall be classified as a liability (or an asset in some circumstances) if, at inception, the monetary value of the obligation is based solely or predominantly on any one of the following:
>
> a. A fixed monetary amount known at inception (for example, a payable settleable with a variable number of the issuer's equity shares)
>
> b. Variations in something other than the fair value of the issuer's equity shares (for example, a financial instrument indexed to the Standard and Poor's S&P 500 Index and settleable with a variable number of the issuer's equity shares)
>
> c. Variations inversely related to changes in the fair value of the issuer's equity shares (for example, a written put option that could be net share settled).
>
> *ASC 480-10-25-14*.

73. ASC 815 offers the following, in relevant part:

> The initial balance sheet classification of contracts within the scope of this Subtopic generally is based on the concept that:
>
> a. Contracts that require net cash settlement are assets or liabilities.

b. Contracts that require settlement in shares are equity instruments.

74. ASC 815 also states:

… unless the economic substance indicates otherwise:

a. Contracts shall be initially classified as either assets or liabilities in both of the following situations:

1. Contracts that require net cash settlement (including a requirement to net cash settle the contract if an event occurs and if that event is outside the control of the entity)
2. Contracts that give the counterparty a choice of net cash settlement or settlement in shares (physical settlement or net share settlement).

75. And further:

Contracts that include any provision that could require net cash settlement cannot be accounted for as equity of the entity (that is, asset or liability classification is required for those contracts), except in those limited circumstances in which holders of the underlying shares (i.e., the acquirer) also would receive cash

***Cash Settlement Portion***

76. The contingent consideration, as initially written in the RFG Acquisition Agreement called for, primarily, net cash settlement of the Earn-Out payments, including for the largest of the required portion, which included a contemplated obligation of $50,000,000 in cash from the Stage 3 Earn-Out alone. In total, $55 million of the Earn-Outs as originally agreed-to were to be paid in cash and approximately $29 million was to be paid in equity.

77. Mr. Duffy made the following assessment: "Under the guidance [referenced and excerpted above], unquestionably, the cash settlement portion of the contingent consideration associated with the Earn-Out payment obligations should have been recorded as a liability (while similarly recognizing that *all* such contingent consideration should have been characterized and recorded as a liability, as ultimately acknowledged by the Company in connection with its restatement of prior-period financials)."

78. Determination regarding whether an instrument should be classified as equity or liability also needs to be evaluated under ASC 815-40-25. More specifically, to be classified as equity, ALL of the following conditions must be met:

- The arrangement permits settlement in unregistered shares.
- The issuer has sufficient authorized, unissued shares to settle the arrangement, after taking into consideration all other commitments requiring issuance of the same series of shares during the full period the arrangement could remain outstanding.
- The arrangement includes an explicit limit on the number of shares necessary for settlement.
- The issuer is not required to make any cash payments to the seller in the event the issuer fails to timely file with the SEC.
- The arrangement does not contain any cash-settled "top off" or "make whole" provisions.
- The arrangement does not provide the seller with rights that rank higher than those of the issuer's shareholders.
- The arrangement does not require the issuer to post collateral under any circumstances.

79. As mentioned above, two amendments were entered into by the parties subsequent to the acquisition date. Both amendments afforded the opportunity for the cash portion of the obligation to be settled by Calavo issuing

shares instead. Amendment 1 was not issued until July 31, 2013, however, and Amendment 2 not until October 1, 2013. Therefore, the cash settlement obligations, at a minimum, should have governed the initial recording of the transaction. Despite the amendments allowing for share settlement to an extent, other factors, as well as provisions simultaneously entered into by the parties in connection with both Amendment 1 and Amendment 2 continued to preclude equity treatment under the accounting rules.

80. Both Amendment 1 and Amendment 2 stated that the "sellers [RFG] shall receive specified price protection from Calavo with respect to", effectively, the sale of the issued common stock or specifically, "the Trust's sale of shares of Common Stock on the NASDAQ Stock Market." Such "price protection" constituted a clear "make-whole provision" under the Accounting rules, as included in the above excerpt from ASC 815-40-25.

81. The literature defines a "make-whole provisions" as follows:

> A cash payment to a counterparty if the shares initially delivered upon settlement if the shares initially delivered upon settlement are subsequently sold by the counterparty and the sales proceeds are insufficient to provide the counterparty with full return of the amount due. While the exact terms of such provisions vary, they generally are intended to reimburse the counterparty for any losses it incurs of to transfer to the entity any gains, the counterparty recognizes the difference between the following:
>
> a. The settlement date value;
>
> b. The value received by the counterparty in subsequent sales of the securities within a specified time after the settlement date.

It is evident, therefore, that, the "price protection" offered by Calavo in connection with the Amendments to the RFG Acquisition Agreement constituted a "top-off" or "make-whole" provision under the accounting rules.

As a result thereof, classification of the contingent consideration as equity was expressly precluded for this reason as well. Additionally, Calavo's restatement states that it made the eventual Earn-Out payments in both cash and stock.

82. Similarly, one of the requirements set forth in ASC 815 with respect to whether equity treatment is appropriate for a financial instrument is that settlement in shares – i.e., the number of shares required to satisfy an obligation - is within the control of the entity (i.e., Calavo, or the purchaser in an acquisition with contemplated contingent consideration). In order to constitute equity, the arrangement must have a limit on the number of shares to be issued (among other things). To that end, ASC 815 also states the following:

> Contract Contains an Explicit Share Limit
>
> For certain contracts, the number of shares that could be required to be delivered upon net share settlement is essentially indeterminate. If the number of shares that could be required to be delivered to net share settle the contract is indeterminate, an entity will be unable to conclude that it has sufficient available authorized and unissued shares and, therefore, net share settlement is not within the control of the entity.

83. As set forth above, and in the Amendments themselves, Calavo, while it could issue shares in lieu of cash of it so choose, the fair value of such shares was to be equal to agreed-upon dollar amounts (i.e., $5 million for Stage 2 and $50 million for Stage 3), which meant there was not an explicit share limit with respect to those elements of the Earn-Out payments. The lack of such rendered the eventual number of shares to be issued indeterminate, and makes it further evident why the contingent consideration relating to the original cash settlement components of the RFG Acquisition Agreement should not have been classified as equity, even as amended.

84. Mr. Duffy noted:

"The contingent consideration relating to the initial-cash components of the Earn-Out payments contemplated in the RFG Acquisition Agreement failed, therefore, to meet the equity requirements because the contingent consideration (a) was initially to be settled in cash, (b) constituted an obligation whose monetary value was based on "variations in something other than the fair value of the issuer's equity shares (i.e., settleable with a variable number of the issuer's equity shares," and because (c) the amendments included a "make-whole" provision in the form of price protection for RFG. The Company knew that, because of the price protection, it was going to have to pay the express dollar amounts originally contemplated for the Stage 2 and Stage 3 (Maximum, ultimately) Earn-Outs regardless of how many shares ultimately were issued."

85. The reality that the criteria for equity classification is so rigorous and inflexible should have raised a red flag for Defendants and those within the financial reporting group at Calavo, especially the CFO, Defendant Bruno, considering Calavo's financial statements were consistently misstated throughout the Class Period as a result of the improper accounting. Mr. Duffy concluded that "[t]his matter should have been critically reviewed by all relevant levels within the financial reporting group to ensure that the accounting for the Earn-Out payment was in compliance with GAAP. In the end, especially as this discussion pertains to the $55 million in Maximum Earn-Out Consideration that was originally contemplated as settleable in cash, there was no ambiguity in the accounting literature as to how or why liability treatment was not only proper and required, but apparent."

86. Mr. Duffy stated that "the classification of the contingent consideration was a significant accounting element and therefore, Defendant

Bruno, as CFO, would or should have been aware of the improper accounting for such[].”

*Share Settlement Portion*

87. As determined in connection with and reflected in Calavo’s 2014 Form 10-K, which included the restatement of prior periods, Calavo ultimately concluded that it had improperly characterized as equity *all* of the contingent consideration associated with the RFG acquisition, which included the amounts initially settleable in cash and those amounts to be settled in shares. With respect to the Earn-Out consideration which was initially contemplated to be settleable in shares, different particular consideration of the accounting rules was appropriate, although ultimately with the same result – the contingent consideration to be settled in shares (i.e., 827,000 shares in connection with Stage 2 Maximum Earn-Out and 434,783 shares in connection with Stage 3 Maximum Earn-Out)(all at $23.00 per share) should have also been characterized as a liability on Calavo’s balance sheet – treatment that was not afforded it until the restatement set forth in, and the filing of, Calavo’s 2014 Form 10-K.

88. Indeed, in the case of Calavo, the Company should have heeded the guidance set forth in ASC 480 and ASC 815 regarding what constituted equity and/or a liability under the accounting rules and, more specifically, the stringent criteria for classifying even those amounts to be settled in shares as equity under such rules.

89. The Stage 2 Earn-Out called for payment in cash (later amended to afford share settlement) and an originally-contemplated, unamended share settlement. At all times, the contemplated Maximum Earn-Out Consideration

was tethered to dollar amounts agreed-upon by the parties in connection with the acquisition, whether settlement was to occur in cash or shares. That is, despite an originally-contemplated "Maximum Earn-Out Consideration" of "5,000,000 in cash and 827,000 Merger Shares," the dollar value of those shares was set at $23.00, which equaled $19,021,000. The relevance of this correlation was reiterated by the following in the RFG Acquisition Agreement, pertaining to the Stage 2 Earn-Out.

> The Stage 2 Earn-Out Consideration shall be payable 79.18% in Merger Shares, value at the Merger Shares Value, and 20.82% in cash.

90. As such, Calavo's obligation under the arrangement to settle the Earn-Out payments by, as GAAP states in ASC 480, "issuing a variable number of its equity shares if, at inception, the monetary value of the obligation is based solely or predominantly on … variations in something other than the fair value of the issuer's shares" required what was initially the cash settlement portion of the Earn-Out arrangement to be, even when swapped for share settlement, recorded as a liability. More specifically, the amount of the Earn-Out was tethered directly to the financial results (i.e., revenues and EBITDA) of RFG, which dictated the ultimate obligation under the Earn-Out arrangement, and which rendered the ultimate number of shares to be issued variable.

91. Additionally, once it became apparent to Calavo that RFG was going to easily achieve the financial metrics required of it to receive the maximum Earn-Out consideration, the maximum payout known at inception (i.e., the $5,000,000 in cash or shares and 827,000 in shares for Stage 2 and the $50,000,000 in cash or shares and 434,783 in shares) had crystallized, making

the obligation probable and estimable and, under the accounting rules, making liability classification and recognition in the income statement a must.

92. More specifically, the Company knew it would have to issue a variable number of shares to pay $5,000,000 and $50,000,000 for Stages 2 and 3, respectively (originally the cash obligations) and, later, that once it was aware RFG was achieving the required thresholds for revenue and EBITDA, shares that equaled $19 million and $10 million (using the "Merger Shares Value" of $23.00).

93. In this regard, the RFG Acquisition Agreement set the following thresholds for RFG in order to earn the "Maximum Earn-Out Consideration" for, respectively, Stages 2 and 3 of the Earn-Out portion of the RFG Acquisition Agreement: EBITDA of $8 million and $15 million, as well as revenues (i.e., net sales) of $130 million and $190 million, for any 12-month period within the Earn-Out Period (i.e., five years from the acquisition closing date). The Company's own public filings indicate that, for the year ended October 31, 2012, RFG had already generated $154 million in net sales, far surpassing the contemplated 12-month revenue threshold for maximum Earn-Out on Stage 2.

94. For the year ended October 31, 2013, well before the Class Period, the Company's own public filings indicate that, for those 12 months, RFG had already generated $191.5 million in net sales, surpassing the contemplated 12-month revenue threshold for maximum Earn-Out on Stage 3. In view of such information and results, Calavo and the Defendants knew well before the Class Period (and throughout) that the maximum Earn-Out obligation of $84 million in total, which was known at inception, had become probable, estimable, and fixed. There was no ambiguity and no judgment left to be made.

95. Mr. Duffy further concluded:

> "Calavo should have accounted for the portion of the contingent consideration settleable in shares as a liability on its balance sheet because (a) Calavo was to issue a variable number of its equity shares based on RFG's performance and the related calculation of the Earn-Out; (b) Calavo knew or should have known that RFG was going to achieve the maximum potential Earn-Out prior to the Class Period; and (c) Calavo itself classified the equity portion as a derivative[]. As such, Defendants were required to re-measure that liability to fair value at each reporting date, recording any gain or, in this case, loss in its income statements throughout the Class Period. Not until the filing of its 2014 Form 10-K, and the restatement of prior financial statements set forth therein, did Calavo and the Defendants record and properly reflect the manner in which these obligations were to be recorded under the accounting rules. As acknowledged within those filings, and as discussed herein, Calavo was required, for many reasons, to classify *all* of the contingent consideration emanating from the RFG Acquisition Agreement (and the amendments thereto) as a liability."

*Re-measuring to Fair Value and Income Statement Impact*

96. ASC 805 explains, in the event contingent consideration associated with an acquisition or business combination is deemed, as is usually the case, to be a liability under the accounting rules, that liability must be re-evaluated periodically in order to determine whether the fair value of such has changed – a consideration which might require recognition in the income statement.

97. The accounting guidance states, specifically:

> Some changes in the fair value of contingent consideration that the acquirer recognizes after the acquisition date may be the result of additional information about facts and circumstances that existed at the acquisition date that the acquirer obtained after that date. Such changes are measurement period adjustments in accordance with paragraphs 805-10-25-13 through 25-18 and Section 805-10-30 [of the FASB codification]. However, changes resulting from events after

> the acquisition date, such as meeting an earnings target, reaching a specified share price, or reaching a milestone on a research and development project, are not measurement period adjustments. The acquirer shall account for changes in the fair value of contingent consideration that are not measurement period adjustments as follows:
>
> a. Contingent consideration classified as equity shall not be remeasured and its subsequent settlement shall be accounted for within equity.
> b. **Contingent consideration classified as an asset or a liability shall be remeasured to fair value at each reporting date until the contingency is resolved**.
>
> *ASC 805-30-35-1; emphasis added.*

98. ASC 815 also states that "[c]hanges in the fair value of all contracts classified as assets or liabilities shall be disclosed in the financial statements as long as the contracts remain classified as assets or liabilities." *ASC 815-40-50-1*.

99. GAAP required, therefore, not only classification of the contingent consideration facing Calavo as a liability but periodic adjustment of the carrying (i.e., fair) value of such liability.

100. Defendants failed to properly classify and account for this contingent consideration during the Class Period, such that the majority of the change in fair value was not adjusted for at each reporting date, presumably because of Defendants desire to avoid any impact on Calavo's reported net income and other earnings-related measures.

101. By failing to properly account for the contingent consideration that emanated from the RFG Acquisition agreement and the corresponding Earn-Out Payments in violation of GAAP and, more specifically, by failing to re-measure periodically the fair value of the liability emanating from the Earn-Out obligations, Defendants caused Calavo's net income to be overstated

throughout the Class Period (and for all the quarterly and annual reporting periods subsumed thereby).

102. Specifically, previously-reported net income for the first three quarters of 2014 was inflated by 325.1%, 331.8% and 933.7% respectively. Operating income for the first three quarters of 2014 was inflated by 240%, 263.9% and 189.9%, respectively. Net income for the restated nine months ended July 31, 2014 totaled $1.3 million, equal to $0.08 per diluted share, which reflected a prior misstatement of 1895% and 2025%, respectively.

*The Company's Incomplete and Misleading Disclosures*

103. Immediately following the acquisition, and payment related to Stage 1, the Company recorded a liability on its books, but only in the amount of $1.543 million, while $7.183 million of contingent consideration was booked in equity, despite the total cash obligation representing 65% of the total possible Earn-Out payment. Mr. Duffy observed that "the Company's disclosures do not make any apparent accounting sense, because the proportion of amounts recorded as equity and liability did not correspond, in any apparent way, to the proportions of cash and equity settlement amounts set forth in the RFG Acquisition Agreement."

104. As later acknowledged by the Company, despite having initially recorded the "cash settlement" portion of the contingent consideration as a liability and the "share settlement" portion as equity (albeit without any apparent relationship to the proportions of those obligations under Stage 2 and Stage 3), even the cash settlement portion($1.543 million) was reclassified to equity (albeit improperly) in connection with Amendments 1 and 2 to the RFG Acquisition Agreement. As discussed herein, such treatment was improper.

105. Despite disclosing the nature of the amendments in its filings, and the magnitude of the contemplated payouts, the Company never communicated to the public that characterizing the contingent consideration as equity was allowing it to forego recording significant and material periodic adjustments to operating income, net income, and EPS for changes in the fair value of the obligations.

106. It is notable, further, that in certain disclosures, Defendants referred to portions of the Earn-Out obligation as derivatives, which has particular relevance from an accounting perspective. Specifically, Calavo's 2013 Form-10K stated:

> As a result of [the RFG] transaction, we evaluated the fair market value of the cash derivative per the Merger Agreement with the equity derivative per this Second Amendment, noting no significant difference.

107. According to ASC 815, if an earn-out obligation constitutes a derivative, it MUST be recorded as a liability. *See, e.g., ASC 815-10-15, stating,"An entity shall recognize all of its derivative instruments in its statement of financial position as either assets or liabilities depending on the rights or obligations under the contracts."* There are no circumstances, therefore, under which contingent consideration with a required net cash settlement or an obligation characterized as a derivative would be recorded as equity. This did not stop Defendants from doing so, however, throughout the Class Period.

**<u>Management's Responsibility for its Financial Statements and Internal Controls</u>**

108. In addition to the Defendants' blatant violation of GAAP under a provision that was not subject to interpretation, the Defendants did not have

proper internal controls, despite their statements to the contrary, in violation of SEC regulations.

109. The SEC requires public companies to adhere to, among other things, rules and regulations regarding financial and non-financial reporting and disclosures. These rules are set forth in the Securities Act of 1933 and the Securities Exchange Act of 1934 as well as later regulations such as the Sarbanes Oxley Act of 2002 ("SOX"), and regulations promulgated thereunder. Specifically, Regulation S-X sets forth the form and content requirements for financial statements to be filed with the SEC. As a public company bound by this regulation, Calavo is required to file annual and quarterly reports with the SEC on Forms 10-K and 10-Q,[6] which includes its financial statements prepared in conformity with GAAP. Management's responsibility to prepare accurate and reliable financial statements in conformity with GAAP is acknowledged in a set of standards known as Generally Accepted Auditing Standards ("GAAS").[7] GAAS outlines the responsibilities of an auditor in performing attestation procedures, but also explains that management is responsible for its own financial reporting:

> **The financial statements are management's responsibility**. The auditor's responsibility is to express an opinion on the financial statements. ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal***

---

[6] Section 13(a) of the Exchange Act and Rule 13a-1 lays out these requirements for all issuers with securities registered under Section 12 of the Exchange Act.

[7] As a result of the passage of the SOX, auditing standards to be used in the performance of, and reporting on, audits of the financial statements of public companies were thereafter established by the Public Company Accounting Oversight Board ("PCAOB"). The PCAOB initially adopted, as its interim standards, the AICPA Codification of Statements on Auditing Standards that were in existence on April 16, 2003. Sections of the adopted standards are referenced with the prefix "AU."

> ***control*** that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***. [Emphasis added; footnote omitted.][8]

110. In addition, the SEC requires that registrants maintain accurate books and records, as well as an adequate system of internal controls, to ensure that their financial statements are prepared in accordance with GAAP, as well as to certify, in accordance with SOX, the veracity of the financial statements filed with the SEC.[9] Financial statements that are filed with the SEC but not prepared in conformity with GAAP are presumed to be false and misleading.

111. Calavo was required to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with GAAP. Section 13(b) 2 of the Securities and Exchange Act of 1934 entitled *Periodical and Other Reports* states the following with respect to books and records:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

---

[8] AU § 110.03.

[9] Section 13(b)(2) of the Securities and Exchange Act of 1934, *Periodical and Other Reports*.

112. The Securities and Exchange Act of 1934 also provides that, with respect to internal controls, an entity must:

> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that--
>
> i. transactions are executed in accordance with management's general or specific authorization;
>
> ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
>
> iii. access to assets is permitted only in accordance with management's general or specific authorization; and
>
> iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

113. SEC regulations require annual financial statements filed with the SEC to be audited by a registered,[10] independent external auditor. The purpose of an audit, as expressed in generally accepted auditing standards ("GAAS") is:

> The purpose of an audit is to provide financial statement users with an opinion by the auditor on whether the financial statements are presented fairly, in all material respects, in accordance with an applicable financial reporting framework, which enhances the degree of confidence that intended users can place in the financial statements. An audit conducted in accordance with GAAS and relevant ethical requirements enables the auditor to form that opinion.

---

[10] With the Public Company Accounting Oversight Board ("PCAOB")

> *AU-C[11] Section 200, Overall Objectives of the Independent Auditor and the Conduct of an Audit in Accordance With Generally Accepted Auditing Standards ("AU-C 200"), ¶4.*

114. The fair presentation of financial statements in conformity with GAAP (as well as the adoption of sound accounting policies and the establishment and maintenance of internal controls) is the responsibility of a company's management. To that end, GAAS state the following:

> **The financial statements subject to audit are those of the entity, prepared and presented by management of the entity with oversight from those charged with governance**. GAAS do not impose responsibilities on management or those charged with governance and do not override laws and regulations that govern their responsibilities. However, an audit in accordance with GAAS is conducted on the premise that management and, when appropriate, those charged with governance have acknowledged certain responsibilities that are fundamental to the conduct of the audit. The audit of the financial statements does not relieve management or those charged with governance of their responsibilities.
>
> *AU-C 200, ¶5; emphasis added.*

115. The auditor's report is the medium through which the auditor expresses or disclaims an opinion on the underlying financial statements which he or she has been engaged to audit, and is required to expressly state whether the audit has been conducted in accordance with GAAS. *See, e.g. AU-C Section 700, Forming an Opinion and Reporting on Financial Statements ("AU-C 700").* The standard audit report includes what is commonly known as an "unqualified" (or "clean") audit opinion, which, as stated above, states that the

[11] Referring to Clarified Auditing Standards section, as promulgated by the American Institute of Certified Public Accountants ("AICPA"), the governing body (along with the PCAOB) of public accountants.

company's financial statements are presented fairly, in all material respects, in conformity with GAAP, as well as express affirmation that an audit was performed in accordance with GAAS, and that sufficient audit evidence was obtained to form an opinion on the underlying financial statements. *See, e.g. AU-C 700.*

116. Additionally, the audit report must reiterate the obligations of management with respect to the financial statements, including the following prescription:

> The auditor's report should describe **management's responsibility for the preparation and fair presentation of the financial statements**. The description should include an explanation that management is responsible for the preparation and fair presentation of the financial statements in accordance with the applicable financial reporting framework; **this responsibility includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error**.
>
> *AU-C 700, ¶ 27; emphasis added.*

117. Quarterly periods, however, do not require an auditor to issue a report. Entities that are registered and file financial reports with the SEC must have performed, in connection with quarterly filings on Form 10-Q, a review of the financial statements set forth therein by a registered, independent external auditor. The auditor, however, does not issue an opinion of any kind with respect to quarterly filings or in connection with the procedures performed. To the

contrary, the task and obligations of the auditor with respect to quarterly review procedures is set forth in the auditing standards as follows:

> The objective of the auditor when performing an engagement to review interim financial information is to obtain a basis for reporting whether the auditor is aware of any material modifications that should be made to the interim financial information for it to be in accordance with the applicable financial reporting framework through performing **limited procedures**.
>
> *AU-C Section 930, Interim Financial Information ("AU-C 930"), ¶ 5; emphasis added.*

118. Indeed, the auditing standards reflect that, contrary to the substantive nature of procedures performed in connection with a year-end audit, quarterly review procedures center on analytical procedures, inquiries, and other review procedures. *See, e.g., AU-C 930, ¶¶ 13-18*. Further, the construct of the report to be issued by an auditor in connection with quarterly review procedures, as prescribed by GAAS, differs greatly from that issued in connection with a full, annual audit, and specifically highlights the limited nature of the procedures expected and purported to have been performed. In that regard, AU-C 930 reflects the following instructions (among other things) with respect to what shall be included in a quarterly review report:

> The auditor's review report should be in writing.
>
> The written review report should include the following:
>
> ***

*d.* A section with the heading "**Management's Responsibility for the Financial Statements" that includes an explanation that management is responsible for the preparation and fair presentation of the interim financial information in accordance with the applicable financial reporting framework; this responsibility includes the design, implementation, and maintenance of internal control sufficient to provide a reasonable basis for the preparation and fair presentation of interim financial information in accordance with the applicable financial reporting framework**.

*e.* A section with the heading "Auditor's Responsibility" that includes the following statements:

i. **The auditor's responsibility is to conduct the review of interim financial information in accordance with auditing standards generally accepted in the United States of America applicable to reviews of interim financial information**.

ii. A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters.

iii. **A review of interim financial information is substantially less in scope than an audit conducted in accordance with auditing standards generally accepted in the United States of America, the objective of which is an expression of an opinion regarding the financial information as a whole, and accordingly, no such opinion is expressed**.

*AU-C 930, ¶¶ 13-18; emphasis added.*

119. The Class Period misstatements in this Action are governed by the auditing standards for quarterly financial statements, since the Class Period only covers Calavo's 3Q2014 financial statements filed with the SEC (as well as Calavo's misrepresentations of those financial statements made in press releases and Company announcements).

120. A system of internal control is intended to help management[12] achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. Furthermore, SEC rules state: "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record or account …"[13]

121. As described herein, Calavo identified and disclosed in its January 14, 2015 press release that, throughout the Class Period, there was a material weakness in its system of internal controls. On January 30, 2015, in its Form 10-K for the year ended October 31, 2014, the Company disclosed the following:

> With the participation of the Chief Executive Officer and Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in the 1992 "Internal Control—Integrated Framework," issued by the Committee of

---

[12] Accounting literature defines management as "persons who are responsible for achieving the objectives of the entity and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policy making functions. Persons without formal titles also may be members of management." *See* Accounting Standards Codification 850-10-20.

[13] §13(b)(5) of the Securities and Exchange Act of 1934.

Sponsoring Organizations of the Treadway Commission. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of October 31, 2014, our internal controls over financial reporting were not effective due to a material weakness in our controls over our accounting for contingent consideration as such applies to business combinations.

As of October 31, 2014, there was a material weakness in the Company's controls over its accounting for and reporting of contingent consideration as such applies to business combinations. Specifically, our controls did not properly identify the failure to apply generally accepted accounting principles with respect to what qualifies as an equity instrument vs. a liability instrument in a business combination. Initially, we recorded the contingent consideration, which was settleable in common stock, as an equity instrument and therefore did not record expense based on the changes in fair value of the contingent consideration. However, the contingent consideration should have been accounted for as a liability requiring re-measurement to fair value. As a result, material errors to the recorded contingent consideration occurred and were not timely detected.

122. PCAOB Auditing Standard No. ("AS") 5, *An Audit of Internal Control Over Financial Reporting That is Integrated with An Audit of Financial Statements* ("AS 5") states that a company's internal controls are not considered to be effective if one or more material weaknesses exist.[14] A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, that creates "a **reasonable possibility** that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." *AS 5-Appendix A7; emphasis supplied.* As stated in the 2014 Form 10-K, a material weakness in the design and

[14] AS 5 ¶ 3.

operation of the Company's internal controls related to its accounting for contingent consideration in connection with business combinations (i.e., the RFG acquisition).

123. Calavo's management purported to have assessed the effectiveness of its internal control over financial reporting throughout the Class Period, as required by SOX and made false and misleading representations regarding such throughout the Class Period. In making its assessment of internal control over financial reporting, and reporting on such in its public filings, Calavo's management should have used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission Report, *Internal Control – Integrated Framework* (1992) ("COSO Report").[15] The COSO Report, borrowing from GAAS, defines fair presentation as having the following attributes:

- The accounting principles selected *and applied have general acceptance,*
- *The* accounting principles are appropriate in the circumstances,
- The financial statements are informative of matters that may affect their use, understanding, and interpretation,

* * *

- The financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements. [Footnote omitted.][16]

---

[15] The COSO report was originally issued in September 1992 as a four-volume set. An *Addendum to Reporting to External Parties* was issued in May 1994. On May 14, 2013 COSO released an updated version of the entire framework. Unless otherwise noted, all references to the COSO report refer to the 1992 issuance.

[16] COSO Report, Risk Assessment, pg. 35.

124. By treating the Earn-Out payment as equity as opposed to a liability, Calavo's management failed to use accounting principles that were appropriate under the circumstances; and thus, issued financial statements that were not fairly presented in accordance with GAAP.

125. The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives.[17] The five components include the Control environment, Risk assessment, Control activities, Information and communication and Monitoring. Calavo clearly had a poor control environment and violated the monitoring components of COSO. Ongoing monitoring includes regular management and supervisory activities as well as specific review processes and procedures to ensure internal controls are designed and operating effectively.

126. A control environment, often referred to as the "tone at the top," describes the atmosphere in which people carry out their daily responsibilities. The Board of Directors and Chief Executive Officer set the "tone at the top" that establishes a positive control environment and affects the integrity and ethics of employees within the Company. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business. Senior managers, in turn, assign responsibility for establishment of more specific internal control policies and procedures to personnel responsible for the unit's functions. As such, the key management of an organization with respect to an effective internal control system includes not

---

[17] COSO Report, Executive Summary.

only the CEO, CFO, and the controller or chief accounting officer, but also senior managers and managers at various segments and divisions.

127. COSO identified several components of the control environment:

> Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.[18]

128. Calavo had a poor control environment wherein it was clear that upper management lacked the requisite amount of integrity, ethical values and competence required from employees of a public company. For example, it was reported that a misstatement in Calavo's Form 10-K for the year ended October 31, 2011, for which the balance sheet was reportedly overstated by approximately $1 million, was allowed to remain on Calavo's books despite the Assistant Controller having brought the accounting error to the attention of the Calavo Controller, James Snyder; the CFO, Defendant Bruno; and Calavo's Director of Human Resources.[19] This type of behavior shows that upper management exhibited a total disregard for the accuracy of its published financial statements and that the control environment at Calavo, especially with respect to financial reporting, was not providing a foundation for accurate and faithful financial reporting.

129. Calavo's accounting department only consisted of about four to five people which included a controller, an assistant controller and two or three

---

[18] COSO Report, Executive Summary.

[19] *Sedo v. Calavo Growers, Inc.*, Ca. Super. Ct., Ventura County, Case No. 56-2015-00463028-CU-WT-VTA.

others. The accounting for the Earn-Out payment would have been prepared and evaluated most-likely by the CFO himself.

130. In connection with the manipulation of the accounting for contingent consideration associated with the RFG Acquisition, there was clearly a lack of effective monitoring by management to ensure the contingent consideration was properly accounted for in accordance with GAAP.

131. On January 15, 2015, in an 8-K filed by the Company, Calavo admitted that it was management's responsibility to maintain internal controls, and specifically that of Defendants Cole and Bruno, yet the Defendants failed to effectively do so:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Internal control over financial reporting refers to the process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, and effected by our Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. With the participation of the Chief Executive Officer and Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in the 1992 "Internal Control—Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of October 31, 2014, our internal controls over financial reporting were not effective due to a material weakness in our controls over our accounting for contingent consideration as such applies to business combinations.

132. Mr. Duffy further stated: "Ultimately, the recording of the transaction as equity, as opposed to as a liability, was a significant accounting element that should have been thoroughly investigated by Defendant Bruno, who was CFO at the time, to ensure that the accounting was proper. By failing to do so, Calavo's publicly-filed financial statements were materially misstated throughout the Class Period."

**Audit Committee Responsibility**

133. According to the Company's Audit Committee Charter dated October 31, 2013, The Audit Committee's authority and responsibilities required, *inter* alia, the following:

- Prepare the annual report of the Audit Committee that is required by the SEC's rules to be included in the Company's proxy statement.

- Evaluate the qualifications, performance and independence of the independent auditor, including considering whether the auditor's quality controls are adequate and whether the provision of permitted non-audit services is compatible with maintaining the auditor's independence and including a review of all relationships between the independent auditor and the Company.

- Evaluate qualifications and performance of the internal audit team members. Review and concur in the appointment, replacement, reassignment, or dismissal of the internal audit team members.

- Meet with the independent auditor prior to the annual audit to discuss the scope, timing, cost and staffing of the audit, and discuss the results of the annual audit with the independent auditor. Consider the effective use of internal audit resources and address the coordination of efforts between internal and external auditors to ensure the completeness of coverage and reduction of redundant efforts.

- Review and discuss with management and the independent auditor the Company's annual financial statements, the disclosures relating to management's discussion and analysis of financial condition and results of operations in the Annual Report on Form 10-K and any certification, report or opinion rendered by the independent auditor, prior to the filing of each such report with the SEC. Recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

- Review and discuss with management and the independent auditor the Company's quarterly financial statements, and disclosures relating to management's discussion and analysis of financial condition and results of operations, prior to the filing of each Quarterly Report on Form 10-Q with the SEC. As appropriate, review and discuss with management and the independent auditor (a) the Company's earnings releases prior to their dissemination, (b) any Company policies and practices with respect to the dissemination of earnings forecasts and earnings guidance, (c) any material financial or non-financial arrangements of the Company that do not appear in the Company's financial statements, and (d) material pending legal proceedings and other material contingent liabilities.

- Review with the independent auditor the auditor's judgments about the quality and appropriateness of the Company's accounting principles as applied in the Company's financial reporting. Discuss with management and the independent auditor, together and in separate executive sessions, quality of earnings, significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles and any issues as to the adequacy of the Company's internal control over financial reporting.

- Periodically review with management and the independent auditor the adequacy and effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, including any significant deficiencies in those areas and including any recommendations offered by such persons for improvement.

- Review with management and internal audit: significant findings on internal audits during the year and management's responses; any difficulties the internal audit team encountered in the course of their audits, including any restrictions on the scope of their work or access to required information, and any changes required in the scope of their internal audit.

- Review with management, internal audit and the independent auditor the adequacy of the Company's internal controls, including computerized information system controls and security and any related significant findings and recommendations of the independent auditors and internal audit services and management's responses

- Discuss with, or obtain reports from, management confirming that the Company is in compliance with applicable requirements relating to financial and accounting matters. Review with management significant internal audit finding and management's responses.

- Review and establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by employees and external parties of concerns regarding questionable accounting or auditing matters.

- Annually, review and approve the enterprise-wide risk assessment and the internal controls work plan prepared by internal audit for the upcoming year.

134. The Defendants admit that the Audit Committee is responsible, with management, in overseeing the preparation and filing of the Company's financial statements and ensuring their accuracy, as stated in the 2014 proxy:

> The Audit Committee assists the Board and management in fulfilling their responsibilities for generally overseeing our financial reporting processes and the audit of our financial statements, including the integrity of our financial statements, our compliance with legal and regulatory requirements, the qualifications and independence of the independent registered public accounting firm, the performance of our internal audit function and the independent registered public accounting firm, and risk assessment and risk management. Among other things, the Audit Committee prepares the Audit Committee report for inclusion in the annual proxy statement; appoints, evaluates and determines the compensation of the independent registered public accounting firm; reviews and approves the scope of the annual audit, the audit fee and the financial statements; reviews our disclosure controls and procedures, internal controls, internal audit function, and corporate policies with respect to financial information and earnings guidance; oversees investigations into complaints concerning financial matters; reviews other risks that may have a significant impact on our financial statements; and reviews transactions with related persons. The Audit Committee works closely with management as well as the independent registered public accounting firm.

135. In 2014, the Audit Committee met six times, yet failed to identify or act upon red flags associated with the misstatement of this Earn-Out consideration and basic accounting principles. The Audit Committee did not comply with its stated duties and responsibilities, as set forth *supra*.

**<u>Confidential Witnesses</u>**

136. Confidential Witness Number 1 ("CW 1") was the Assistant Controller of Calavo from May 2006 until September 2011. CW 1 reported to the Controller, James Snyder. CW 1 stated that Calavo's accounting department

only consisted of about four to five people, which included a controller, an assistant controller, and two or three others. CW 1 indicated that CW 1 was responsible for inventory accounting, managing accounts payable, and receivables for consigned commodities.

137. CW 1 stated that the accounting group had a committee meeting at the end of each month. The meetings consisted of four to five people, including the Controller, and CFO of the Company. During the meetings, the accountants discussed "adjusting journal entries" for each division to ensure the books were accurate. Everyone at these meetings, including the Controller and the CFO, Defendant Bruno, reviewed the accounting records to purportedly ensure their accuracy.

**Materially False and Misleading Statements Issued During the Period**

138. On the first day of the Class Period, September 9, 2014, Calavo announced results for its fiscal 2014 third quarter through a press release. The press release stated:

> Calavo Growers, Inc. (Nasdaq-GS: CVGW), a global avocado-industry leader and expanding provider of value-added fresh food, today reported record fiscal 2014 third-quarter results, with net income from recurring business operations rising to a new historic high for any single period in company history and all other key metrics reaching unprecedented levels. The record net income from recurring operations eclipses the previous all-time high set in the immediately prior quarter, according to the company.

139. This statement was false and misleading because net income for the third quarter of fiscal 2014 was misstated by 933.7%, due to the fact that the Company violated GAAP by not classifying the contingent consideration associated with the acquisition of RFG as a liability but instead as equity and,

thereby, failing to record periodic expenses for the changing fair value of that obligation. At the time of this misstatement, the Company knew (1) that the standard for equity classification of a contingent consideration was so rigorous and inflexible that a red flag should have been identified by the financial reporting group for classifying the contingent consideration as such; and (2) that, by recording the consideration in equity, rather than as a liability, it was avoiding any negative impact on Calavo's income statement.

140. The press release further stated:

> For the three months ended July 31, 2014, before giving effect to the non-operating gain, net income advanced 31.6 percent to $8.4 million, equal to $0.53 per diluted share, from $6.4 million, or $0.43 per diluted share in the corresponding quarter last year.
>
> ***
>
> Operating income in the fiscal 2014 third quarter grew to $10.7 million, an increase of 14.4 percent from $9.4 million in the like quarter one year ago.

141. This statement was false and misleading because net income for the third quarter of fiscal 2014 was misstated by 933.7%, operating income was misstated by 189.9%, and earnings per share were overstated by 920% due to the fact that the Company violated GAAP by not classifying the contingent consideration associated with the acquisition of RFG as a liability, but instead, as equity, and thereby, failed to record periodic expenses for the changing fair value of that obligation. Further, at the time of this misstatement the Company knew (1) that the standard for equity classification of a contingent consideration was so rigorous and inflexible that a red flag should have been identified by the financial reporting group for classifying the contingent consideration as such;

and (2) that, by recording the contingent consideration in equity rather than as a liability, it was avoiding any negative impact on Calavo's income statement.

142. The press release further stated:

> For the nine months ended July 31, 2014, before the gain from the FreshRealm deconsolidation, net income rose 68.8 percent to $19.1 million, equal to $1.21 per diluted share, from $11.3 million, or $0.76 per diluted share, in the initial three quarters last year. Including the gain, year-to-date net income totaled $26.7 million, equal to $1.70 per diluted share.

143. These statements were false and misleading because net income for the third quarter of 2014 was overstated by 933.7% and earnings per share was overstated by 920% due to the fact that the Company violated GAAP by not classifying the contingent consideration associated with the acquisition of RFG as a liability but, instead, as equity and, thereby, failed to record periodic expenses for the changing fair value of that obligation. The restated net income for the nine months ended July 31, 2014 totaled $1.3 million, equal to $0.08 per diluted share, which reflects misstatements of 1895% and 2025%, respectively.

144. At the time of this misstatement the Company knew (1) that the standard for equity classification of a contingent consideration was so rigorous and inflexible that a red flag should have been identified by the financial reporting group for classifying the contingent consideration as such; and (2) that, by recording the contingent consideration in equity rather than as a liability, it was avoiding any negative impact on Calavo's income statement.

145. The press release stated that operating income for the three months ended July 31, 2014 was $11,514,000.00 and net income was $16,032,000.00as well as the following financial information:

| | Three months ended July 31, 2014 | Three months ended July 31, 2013 | Nine months ended July 31, 2014 | Nine months ended July 31, 2013 |
|---|---|---|---|---|
| Net sales | $ 218,702 | $ 194,943 | $ 581,761 | $ 500,778 |
| Cost of sales | 197,757 | 176,865 | 528,149 | 458,040 |
| Gross margin | 20,945 | 18,078 | 53,612 | 42,738 |
| Selling, general and administrative | 9,431 | 8,706 | 26,814 | 25,717 |
| Operating income | 11,514 | 9,372 | 26,798 | 17,021 |
| Interest expense | (220) | (293) | (768) | (862) |
| Gain on deconsolidation of FreshRealm | 12,622 | - | 12,622 | - |
| Other income, net | 120 | 209 | 525 | 582 |
| Income before provision for income taxes | 24,036 | 9,288 | 39,177 | 16,741 |
| Provision for income taxes | 8,064 | 3,163 | 13,318 | 5,742 |
| Net income | 15,972 | 6,125 | 25,859 | 10,999 |
| Add: Net loss attributable to noncontrolling interest | 60 | 274 | 858 | 320 |
| Net income attributable to Calavo Growers, Inc. | $ 16,032 | $ 6,399 | $ 26,717 | $ 11,319 |
| Calavo Growers, Inc.'s net income per share: | | | | |
| Basic | $ 1.02 | $ 0.43 | $ 1.70 | $ 0.77 |
| Diluted | $ 1.02 | $ 0.43 | $ 1.70 | $ 0.76 |
| Number of shares used in per share computation: | | | | |
| Basic | 15,760 | 14,848 | 15,748 | 14,786 |
| Diluted | 15,769 | 14,870 | 15,756 | 14,807 |

146. These statements were false and misleading because the Company did not have operating income of $11,514,000.00 — rather it had a loss of $12,811,000.00 (a misstatement of 189.9%), and net income was actually only $1,551,000.00, an overstatement of 933.7%, due to the fact that the Company's improper recording of contingent consideration associated with the acquisition of RFG (i.e., as equity instead of as a liability) meant Calavo had failed to record, and thereby avoided, material expenses for the change in the fair value of such consideration, which would have reduced net income significantly.

147. At the time of this misstatement the Company knew (1) that the standard for equity classification of a contingent consideration was so rigorous and inflexible that a red flag should have been identified by the financial reporting group for classifying the contingent consideration as such; and (2) that, by recording the contingent consideration in equity rather than as a liability, it was avoiding any negative impact on Calavo's income statement.

148. CEO Defendant Cole further stated in the press release:

> Our exceptional capabilities sourcing and selling fresh avocados from Mexico have allowed us to profitably navigate the market-condition

> headwinds resulting from the limited California fruit volume this year. These factors unquestionably have been a drag on the all-source fruit supply and constrained consumption during the current year. From early indicators and as I have previously stated, we expect to see avocado-industry consumption growth resume in September and October and begin to accelerate in the first half of 2015.

149. The press release further stated the "Diluted EPS from Operations Rises to $0.53—New All-Time High—from $0.43 One Year Ago."

150. These statements were false and misleading because Diluted EPS was materially overstated. EPS was actually only $0.09, rather than $0.53. At the time of this misstatement, the Company knew (1) that the standard for equity classification of a contingent consideration was so rigorous and inflexible that a red flag should have been identified by the financial reporting group for classifying the contingent consideration as such; and; (2) that, by recording the contingent consideration in equity, rather than as a liability, it was avoiding any negative impact on Calavo's income statement.

151. The reported Adjusted EPS for the third quarter of 2014 fell far short of the analyst consensus estimate of $0.46, despite the false positive news promulgated by Defendants during the Class Period which suggested EPS had exceeded the analyst consensus estimate of $0.46 by $.08 per diluted share—or more than 13%.

152. On this false positive news, the Company stock price jumped $4.45, or 11.5%, from $38.65 on September 8, to $43.10 on September 10, 2014.

153. On this same date, the analysts who followed the stock reiterated the misstated numbers and shadowed the positive remarks of the Company. Analysts Brett M. Hundley and Omar J. Mejias, of BB&T Capital Markets, said that Calavo had a "Solid Q3**.** CVGW reported Q3'14 EPS of $0.53 compared to our estimate of $0.45 and consensus of $0.46. Sales of $218.7M were above our

$210M forecast, while gross margin was 15 bps better." Kurt Frederick of Wedbush reported the same numbers the Company reported, and said that the Company had "EPS upside on continued momentum in fresh-cut and vegetable business."

154. On September 10, 2014, Chris Krueger of Lake Street Capital Markets said "Calavo posted strong 3Q2014 results, with EPS of $0.53 easily beating our $0.44 estimate. The Company has effectively managed through the weak California avocado crop and is seeing a boost in sales growth from both its Calavo Foods and RFG segments."

155. On September 15, 2014, the Company filed with the SEC its Form 10-Q for the quarter ended July 31, 2104, which reiterated the Company's previously announced and inflated quarterly financial results, was signed by Defendants Cole and Bruno, and contained SOX Certifications signed by Defendants Cole and Bruno.

156. The 10-Q included the following financial statement information:

| | Three months ended July 31, 2014 | Three months ended July 31, 2013 | Nine months ended July 31, 2014 | Nine months ended July 31, 2013 |
|---|---|---|---|---|
| Net sales | $218,702 | $194,943 | $581,761 | $500,778 |
| Cost of sales | 197,757 | 176,865 | 528,149 | 458,040 |
| Gross margin | 20,945 | 18,078 | 53,612 | 42,738 |
| Selling, general and administrative | 9,431 | 8,706 | 26,814 | 25,717 |
| Operating income | 11,514 | 9,372 | 26,798 | 17,021 |
| Interest expense | (220) | (293) | (768) | (862) |
| Gain on deconsolidation of FreshRealm | 12,622 | — | 12,622 | — |
| Other income, net | 120 | 209 | 525 | 582 |
| Income before provision for income taxes | 24,036 | 9,288 | 39,177 | 16,741 |
| Provision for income taxes | 8,064 | 3,163 | 13,318 | 5,742 |
| Net income | 15,972 | 6,125 | 25,859 | 10,999 |
| Add: Net loss attributable to noncontrolling interest | 60 | 274 | 858 | 320 |
| Net income attributable to Calavo Growers, Inc. | $ 16,032 | $ 6,399 | $ 26,717 | $ 11,319 |
| Calavo Growers, Inc.'s net income per share: | | | | |
| Basic | $ 1.02 | $ 0.43 | $ 1.70 | $ 0.77 |
| Diluted | $ 1.02 | $ 0.43 | $ 1.70 | $ 0.76 |
| Number of shares used in per share computation: | | | | |
| Basic | 15,760 | 14,848 | 15,748 | 14,786 |
| Diluted | 15,769 | 14,870 | 15,756 | 14,807 |

157. These statements were false and misleading because the Company did not have operating income of $11,514,000.00, but a loss of $12,811,000.00 (a misstatement of 189.9%), and net income was, instead, $1,551,000.00, reflecting an overstatement of 933.7%, due to the Company's improper recording of contingent consideration associated with the acquisition of RFG (i.e., as equity instead of as a liability). Diluted earnings per share was overstated by $0.93, and, after having been restated, was only $0.09. At the time of these misstatements, the Company knew (1) that the standard for equity classification of a contingent consideration was so rigorous and inflexible that a red flag should have been identified by the financial reporting group for classifying the contingent consideration as such; and (2) that by recording the contingent consideration in equity rather than as a liability, it was avoiding any negative impact on Calavo's income statement.

158. The 10-Q further stated:

> Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective.

159. These statements were false and misleading because the Company did not have an adequate system of internal controls to ensure that its financial statements were prepared in accordance with GAAP. At the time of the misstatements, the Company knew or should have known that it had a material weakness in its system of internal controls which caused or permitted the egregious mistreatment of the contingent consideration.

160. As a result of the foregoing material misstatements related to the state of the Company, its financial results, and the purported effectiveness of its system of internal controls, Calavo's reported earnings (as reflected in measures of EBITDA, net income and EPS) were materially inflated during the Class Period. In direct response to said misreporting (i.e., the inflation of its financial results), the Company's stock price soared to as high as $47.97 per share during the Class Period.

161. On September 23, 2014, the Company filed with the SEC a Form 8-K announcing the payment of the Earn-Out provision. The 8-K was signed by Defendant Cole and stated:

> Pursuant to that certain Agreement and Plan of Merger between Calavo Growers, Inc. ("we," "Calavo," or "the Company") and Renaissance Food Group, LLC ("RFG") and Liberty Fresh Foods, LLC, Kenneth Catchot, Cut Fruit, LLC, James Catchot, James Gibson, Jose O. Castillo, Donald L. Johnson and RFG Nominee Trust

> (collectively, the "Sellers"), as described in our Current Report on Form 8-K filed with the Securities and Exchange Commission on June 1, 2011, and the related Amendments, as described in our Current Reports on Form 8-Ks filed with the Securities and Exchange Commission on September 4, 2013 and November 26, 2013 (collectively, the "Amended Agreement"), we agreed to make Earn-Out payments to the Sellers upon the satisfaction of certain performance requirements specified in the Amended Agreement. The Amended Agreement states that, upon the attainment of the Stage 3 Maximum Earn-Out Trigger, the Company shall be obligated to pay $50,000,000 in Calavo common stock and an additional 434,783 shares of Calavo common stock. The Amended Agreement states that the Stage 3 Maximum Earn-Out Trigger shall be met if, for a trailing 12-month period, three months in a row, (1) the EBITDA for RFG is equal to or greater than $15,000,000 and (2) the Revenue for RFG is equal to or greater than $190,000,000. On October 23, 2014, based on the results of operations to date, the Stage 3 Maximum Earn-Out Trigger was met and we issued 434,783 shares of unregistered Calavo common stock to the Sellers. Additionally, on October 23, 2014, we issued $50,000,000 in unregistered Calavo common stock to a trust for the benefit of the Sellers using the closing stock price on October 23, 2014, which calculated to 1,097,213 shares. We anticipate filing a Form S-3 registration statement that will register the resale of these 1,097,213 shares. The issuance of the shares of common stock described in this Item 3.02 is exempt from registration under the Securities Act of 1933 by reason of the securities registration exemption contained in Section 4(2) of the Securities Act of 1933 for a transaction by an issuer not involving a public offering.

## <u>THE TRUTH EMERGES</u>

162. On January 15, 2015, the Company issued a press release that stated:

> Calavo also will disclose today in a Form 8-K filing with the U.S. Securities and Exchange Commission that it will record a non-cash charge—which the company treats as amortization expense—totaling, over all periods, $88.9 million before tax ($54.0 million net of tax) related to a misstatement in its treatment of contingent consideration in its acquisition of RFG in June 2011. This non-cash

misstatement in its historical financial statements relates to equity payments made to the sellers when RFG's operating results exceeded defined thresholds. As previously reported, RFG's results substantially exceeded all performance targets and, accordingly, its former owners received the maximum Earn-Out provided under the acquisition agreement, which was paid in cash and stock. The Company recorded contingent consideration expense related to the acquisition of RFG totaling $54.0 million for fiscal year 2014, as compared to $32.3 million in fiscal 2013, as well as $12.9 million for the fourth fiscal quarter of 2014, as compared to $18.8 million for the fourth fiscal quarter of 2013. There will be no further charges with respect to the RFG acquisition agreement. As point of note, under Calavo ownership RFG revenues have grown from a fiscal 2011 "run rate" of $94.1 million to $252.3 million for the fiscal year ended Oct. 31, 2014. In that same period, RFG EBITDA has risen from $2.6 million to $16.0 million. Initially, Calavo recorded the contingent consideration, which was settleable in common stock, as an equity instrument and, therefore, did not record expense based on the changes in fair value of the contingent consideration. The company now believes, however, that the contingent consideration should have been accounted for as a liability, requiring re-measurement to fair value and expense recognition, which Calavo is treating as amortization expense, at each reporting period subsequent to the acquisition. Further, all information related to the specifics of payments of the RFG Earn-Out payment has been accurately explained in all of the company's filings and all payments have been accurately settled.

163. In the press release, Defendant Cole stated:

Let me underscore that the contingent consideration liability is a noncash charge. It has no impact on Calavo's cash position whatsoever.[20] Further, the change does not alter either the company's

[20] With accrual-basis based accounting, cash is not particularly relevant, making even Defendants' disclosures about the Restatement confusing.. Instead, entities must match the timing of expenses and corresponding revenues and record such in prior periods. GAAP financial statements, which generate and reflect the net income and EPS measures reported by the Company, are prepared using accrual-basis accounting (and not cash-basis accounting)..

> historical or current earnings before interest, taxes, depreciation and amortization (EBITDA) and has no impact on the company going forward. Furthermore, there will be no additional non-cash charges, as this transaction is now completed, and all details of the Earn-Out have been correctly outlined in all SEC filings over the last three-and-a-half years…It is a unique accounting issue related to structuring the purchase with a large Earn-Out component. To that end, we believe that reporting adjusted annual and quarterly net income and adjusted per-share results for these related periods—exclusive of the Earn-Out-specific, non-cash charge as we are doing in this release—provide the most meaningful way to look at the profitability, underlying strength and on-going performance of Calavo's businesses. Finally, it is important to reiterate that the success of the RFG transaction itself triggered this charge, and is a reflection of acquiring that business on risk-averse terms.

164. The Company has now admitted, therefore, both that the Earn-Out payments were made at least partially in cash (despite the Amendments to the RFG Acquisition Agreement discussed herein) and that the contingent consideration should have been accounted for as a liability, requiring re-measurement to fair value as of the end of each reporting period (quarterly or annual) subsequent to the acquisition and, if necessary, expense recognition based on changes in the fair value of the obligation (which Calavo treated in the restatement as amortization expense). The magnitude of the expense Calavo failed to timely and properly record was $88.9 million before tax ($54.0 million net of tax).

165. On this news, the Company's stock price declined $7.62, or 16%, from $47.79 on January 14, 2015 to $40.17 on January 16, 2015.

166. Immediately following the two day drop, on January 20, 2015, the next trading day, analyst Farha Aslam("Aslam") from Stephens issued an analyst

report attributing the Company's stock price decline substantially to the uncertainty around Calavo's accounting treatment for the contingent consideration. Aslam stated, "CVGW shares were down ~15% in the two days following the Company's F4Q14 earnings release, reflecting 1) the EPS shortfall vs. the consensus expectation and 2) uncertainty around the accounting restatement associated with the RFG earnout."

167. Analyst Stephens further called the restatement and its relationship to a misstatement in the treatment of the contingent consideration a "key point" in determining a target price for Calavo.

168. Indeed, upon the disclosure of Defendants' wrongful acts and omissions, namely the misstatements with respect to GAAP for the accounting treatment afforded the contingent consideration, the price of Calavo common stock declined precipitously, which caused Plaintiffs and other Class members to suffer significant losses and damages.

169. Defendants give no explanation as to why they initially recorded the contingent consideration as equity when the acquisition agreement and the prevailing accounting guidance all called for liability treatment. The accounting rules were quite clear regarding how such contingent consideration needed to be treated from an accounting perspective, including the reality that the requirements for equity treatment of such were stringent and clearly not met by the terms of the RFG Acquisition Agreement (as originally entered into or by virtue of later amendments).

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

170. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of a Class consisting of all those who purchased or otherwise acquired Calavo securities during the Class

Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have, or had, a controlling interest.

171. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Calavo Class Period, securities of Calavo were actively traded on the NASDAQ Global Select Market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Calavo, or their transfer agents, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

172. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

173. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

174. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Calavo;
- whether the Individual Defendants and the Audit Committee Defendants caused Calavo to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Calavo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

175. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

176. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Calavo securities are traded in efficient markets;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased and/or sold Calavo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

177. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

178. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5 Against Calavo and the Individual Defendants

179. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

180. This Count is asserted against Calavo and the Individual Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

181. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Calavo securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Calavo securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

182. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Calavo securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Calavo's finances, financial results and business prospects.

183. By virtue of their positions at Calavo, Defendants had actual knowledge of the materially false and misleading statements and material

omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

184. The Individual Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit by meeting certain financial metrics to receive huge bonus packages.

185. Information showing that Defendants acted knowingly, or with reckless disregard for the truth, is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Calavo, the Individual Defendants had knowledge of the details of Calavo's internal affairs and financial statements.

186. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to, and did, directly or indirectly control the content of the statements of Calavo. As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Calavo's businesses, operations, financial results, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Calavo securities was

artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Calavo's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Calavo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants , and were damaged thereby.

187. During the Class Period, Calavo securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Calavo securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, nor would they have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Calavo securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Calavo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

188. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

189. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in

connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

## Violation of Section 20(a) of The Exchange Act Against The Individual Defendants and the Audit Committee Defendants

### Individual Defendants

190. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191. During the Class Period, the Individual Defendants participated in the operation and management of Calavo, and conducted and participated, directly and indirectly, in the conduct of Calavo's business affairs. Because of their senior positions, they knew the adverse non-public information about Calavo's misstatement of income and expenses and false financial statements.

192. As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Calavo's financial condition and results of operations, and to promptly correct any public statements issued by Calavo which had become materially false or misleading.

193. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Calavo disseminated in the marketplace during the Class Period concerning Calavo's results of operations. Throughout the Class Period, the Individual Defendants exercised

their power and authority to cause Calavo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Calavo within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Calavo securities.

194. Defendants Cole and Bruno were authorized to, and did, participate in the release of the financial statements and signed off on the statements as correct, despite the statements containing materially false and misleading statements, thus qualifying them as control person(s) under §20(a).

195. Each of the Individual Defendants, therefore, acted as a controlling person of Calavo. By reason of their senior management positions and/or being directors of Calavo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Calavo to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Calavo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

196. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Calavo.

**Audit Committee Defendants**

197. As members of the audit committee, the Audit Committee Defendants had an affirmative duty of oversight and responsibility for the integrity of Calavo's financial reporting.

198. As chair of the audit committee, Defendant Carbone was involved with the creation or approval of the financial statements included in Calavo's SEC 10–Q and 10–K filings. The Audit Committee delegated authority to the chair of the Audit Committee to pre-approve or ratify transactions where the aggregate amount involved is expected to be less than $200,000.

199. During their tenure as directors of Calavo, each of these Defendants was a controlling person of Calavo within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as directors, and Audit Committee members, of Calavo, these Defendants had the power and authority to cause Calavo and the Officer Defendants to engage in the wrongful conduct complained of herein. These Defendants were able to, and did, control, directly and indirectly, the content of the public statements made by Calavo during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

200. Calavo maintains an Audit Committee, composed of certain Board members, that reports to Calavo's full Board of Directors. As detailed above, at some time during the Class Period, Defendants Carbone, Barnes, DiGregorio, Hollister and Hunt (the "Audit Committee Defendants") each participated as a member of the Audit Committee.

201. As set forth herein, each of these Defendants had the power to control and/or influence the particular practices and conduct giving rise to the securities violations alleged herein, and exercised the same. In their capacities as directors and members of the Audit Committee of Calavo, and during their tenure, these Defendants each reviewed the false and misleading financial

statements filed with the SEC and disseminated to the public. As a result, these Defendants were controlling persons within the meaning of Section 20(a) of the Exchange Act.

202. According to the Audit Committee Charter, the Audit Committee performed the following functions: (1) assisted with the oversight of the integrity of the Company's financial reporting process and financial statements and systems of internal controls; (2) prepared the annual report of the Audit Committee; (3) evaluated the qualifications, performance, and independence of the independent auditor; (4) evaluated qualifications and performance of the internal audit team members; (5) met with the independent auditor prior to the annual audit to discuss the scope, timing, cost and staffing of the audit, and discuss the results of the annual audit with the independent auditor; (6) reviewed and discussed with management and the independent auditor the Company's annual financial statements, the disclosures relating to management's discussion and analysis of financial condition and results of operations in the Annual Report on Form 10-K; (7) reviewed and discussed with management and the independent auditor the Company's quarterly financial statements, and disclosures relating to management's discussion and analysis of financial condition and results of operations, prior to the filing of each Quarterly Report on Form 10-Q; (8) reviewed with the independent auditor the auditor's judgments about the quality and appropriateness of the Company's accounting principles; (9) reviewed with management and the independent auditor the adequacy and effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting; (10) reviewed with management and internal audit; (11) reviewed with management, internal audit, and the independent auditor the adequacy of the Company's internal controls; (12)

obtained reports from management, confirming that the Company is in compliance with applicable requirements relating to financial and accounting matters; (13) reviewed and established procedures for (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and (b) the confidential, anonymous submission by employees and external parties of concerns; and (14) reviewed and approved the enterprise-wide risk assessment and the internal controls work plan prepared by internal audit for the upcoming year.

203. As a result of their positions as Audit Committee members, over and above their positions as Board members, each of the Audit Committee Defendants is liable as a control person of Calavo within the meaning of Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against all Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring all Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 29, 2015

Respectfully submitted,

/s/ Leigh Handelman Smollar

**POMERANTZ LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
Mark Bryan Goldstein
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
lsmollar@pomlaw.com
mbgoldstein@pomlaw.com

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
migross@pomlaw.com
jalieberman@pomlaw.com

**POMERANTZ LLP**
JENNIFER PAFITI (#282790)
468 North Camden Dr.
Los Angeles, California 90210
Telephone: (310) 285-5330
E-mail: jpafiti@pomlaw.com

***Lead Counsel for Lead Plaintiffs and the Class***